Ruffin, C. J.
 

 If the grounds, upon which the bill impeaches the transactions between the defendants, be founded in facts, there cam be no hesitation in holding, that they amount to a fraud in law against the plaintiff, as a creditor. For no device can be more deceptive and more likely to bailie, delay, or defeat creditors, than the creating incumbrances upon their property by embarrassed men, for debts that are fictitious or mainly so. The false pretence of a debt, or the designed exaggeration of one, is an act of direct fraud. That is one of the allegations of the bill against this deed.
 

 Another is, that property, to a much greater value than the alleged debt from the one brother to the other, was conveyed, and that this was done with the design, that, before the plaintiff could get a judgment, the property should be brought to a sale, so conducted as to enable the defendant, Spencer, to buy it at prices far below its value, as a mode by which, under the form of a public sale,
 
 prima, facie
 
 fair, the one brother’s property could become vested in the other, without an adequate valuable consideration, or by which the one should get the title, apparently for himself, but in reality upon some confidence for the maker of the deed. And there can be no doubt, allowing even the whole debt mentioned in the deed to have been owing, that the conveyance of proper^ ty to secure it, and with the further intentions supposed, would be fraudulent, for the want of
 
 Iona fides.
 
 It would be an attempt by “a debtor, so far as the value of the property exceeded the debt, indirectly to convey it to a friend, voluntarily and without valuable considera
 
 *146
 
 tion; or, in the other point of view, it would be a conveyance to enable the creditor, under cover of obtaining payment of his debt, to make purchases either wholly, or in part, upon a secret trust for the debtor. Such a contrivance, if directly proved, amounts to express fraud ; and, if to be fairly collected from tbe conduct of the parties, and the attendant and subsequent circumstances, the same consequences must follow. It is calculated to deceive the world by putting the title out of the debtor, and vesting it in the purchaser, pretendedly for the sole use of the latter, so as to exempt the property from execution, while the debtor is to enjoy, in some way, a benefit from the profits, or, perhaps, the possession of at least part of the property. It is, then, to be considered, whether the allegations of tbe bill are sustained by proofs or rational presumptions.
 

 Upon the point of the indebtedness of Micajah Alston to bis brother Spencer, the Court is obliged to say, the defendants have not given satisfactory evidence; and that there are very strong grounds of suspicion against it, and, especially, as to its amount, or any thing near it. The debt to John H. Alston, for which Spencer was surety, appears to have been nearly as stated in tlie deed. That is tbe only debt, the origin and amount of which are established with any certainty. The others are stated to be due to Spencer himself, on three bonds, as follows : One, of July 20th, 1841, for $284 47 ; a second, of December 15th, 1842, for $54 34 ; and the third, of January 30th, 1843, for $1,475 60 — making, in all, the sum of $1,814 41. The bonds have no subscribing witness, and are proved merely by tlie hand-writing of the obligor. Tbe deed was executed on tbe day after the last bond was given.
 

 Transactions of this kind, between near relations, are naturally so much more the objects of suspicion, than those between strangers, that it is to be expected that parties, when father and son, or brothers, should offer
 
 *147
 
 something more than the naked bond of the one to the other, as evidence of the alleged indebtedness, especially when the bond is executed recently, and followed immediately by a deed of trust for all the debtor’s property. A bond may be voluntary, and such an one, though binding between the parties, cannot stand before other debts arising out of contracts for value. Rev. St. c. 50, s. 1.
 
 Lachnere
 
 v.
 
 Earl of Carlisle,
 
 3 Pr. Wins. 211.
 
 Jones
 
 v,
 
 Powell,
 
 1 Eq. Cas. Abr. 84. Indeed, it may be fabricated for the occasion of creating the encumbrance, as an obstacle to
 
 bona fide
 
 creditors. Therefore, all persons may be called on to offer some probable proof of dealings, out of which a debt might have arisen to the amount of the bonds produced or approaching it; and, especially, persons very nearly connected ought to be provided with stronger evidence on those points. It is an act of but common precaution, which every man owes to his own character, when a bond is executed between brothers for such a sum as #1,475 60, under such circumstances, and upon a settlement, as alleged, for previous dealings running through several years, that the parties should come to their settlement in the presence of disinterested third persons, capable of understanding and proving what, in fact, were the subject matters of the settlement, so as to afford other creditors the opportunity of investigating the correctness both of the charges and the credits in it. Indeed, in the ordinary course of business, no one lets accounts run up to such sums without some entry in a book or some statement of the items on paper. It can hardly be possible, that all the items in dealings for so long a period as nine years, from 1834 to 1843, should have all been on one side. Therefore, some account must have been stated between these parties, as the basis for the bond of #1475 60; which the defendants ought to have been able to identify by an indifferent witness, or, at least, to have produced and verified by their own oath. But there is no witness to that
 
 *148
 
 point, nor document of that kind; which certainly could not fail to excite surprise, as very extraordinary, if the -settlement was a real settlement between debtor and .creditor, in which each stood up for his rights. Instead of. that, there is nothing but the three bonds ; neither of, which was ever seen, or heard of by a.ny one else, as far as appears, until the execution of the deed. There is an attempt, however, to prove by witnesses, that there have been, in former, times, some dealings between the .brothers, on which Micajah became the debtor of Spencer. It appears, that in March, 1841, the latter did assume for the former, a debt to Yarborough and Perry for :$239 83. We are not informed why that was done, it does not appear that the creditors suspected Micajah’s .credit, but merely that Spencer took the debt on himself. The legal inference would be, perhaps, that he was thereby paying a debt of his own to his brother. But admit it to be otherwise; and that may account for the first bond of 1284 47, of July 20th, 1841, If that bond included the payment to Y. and P. the debt may be assumed to be that far just. But there the case hangs, we believe. There is no probable proof to uphold the other bonds. It is, indeed, stated that, in 1841 or 1842, Micajah purchased a horse in the neighborhood for
 
 $
 
 175, and that he said his brother lent him $75 at the time for a payment in part, and gave his bond to the seller for the .residue. But no reason bas been given, why the seller of the horse has not been examined to prove these facts, instead of relying on Micajab’s declarations alone. Again it is stated, that, between 1834 and 1839, Micajah lived in his brother’s family about four years, for which $500 would bo a moderate charge, and that, in 1838 or 1837, he purchased a horse from Spencer at $150. Upon that, several observations may be made. It does not appear that Spencer intended to charge board. Nothing , was ever said by either of the brothers to that effect. If Spencer intended to make the other pay for board, as he,
 
 *149
 
 no doubt, did for the horse, it is hardly possible that he should have waited until January, 1843, without receiving any payment on account, or taking a bond for those demands, as he had, in the meanwhile, done for the other of $284 47. It must strike one, therefore, as highly probable, that there were mutual dealings, and those demands — if that for board ever existed — were satisfied in account. But there is another objection to all these last items, which is insuperable under the circumstances. It is, that the defendants, who knew the fact perfect^, and were called on to state it on this point particularly, would not venture to swear in their answers, that any part of the sums for which the bonds are given, was for the horse sold, or for board. The bill charges, that the debts or the greater part of them, were not really owing, and therefore, that the principal bond of $1,475 60 was devised of express covin; and it proceeds further to interrogate the defendant specially, what debts Micajah owed Spencer, when and how contracted, and upon what considerations. Now, although the defendants had been incautious enough to act without a witness to their dealings, yet, when the opportunity was thus afforded them for offering full explanation, and making their answers, responsive to the «barges and interrogatories of the bill, evidence for them, one could not have expected less than that they would have gone into the matter, in detail, stated the account on both sides particularly, and accounted for the delay in taking the bonds. But instead of such a narrative, not equivocal nor evasive, but full and direct, as they could have given, and, if the bouds were fair, would probably have given, the answer. on ly states, that the debts were due upon bonds, as described in the deed; that they were justly due, and remained unpaid when the deed was executed; and that “ the said bonds were executed in part for money advanced by said Spencer at different times, either as loans to Micajah, or to pay debts for him, or for debts for which the said Spen
 
 *150
 
 cer was bound as surety for him.” It is obvious, that this is no answer to the points on which the discovery was sought. The defendants say the bonds were unpaid; and no doubt that is true. They say also, that they were justly due; which may likewise be true, in a certain sense — that is, as between themselves, although they were in the main voluntary bonds. The true enquiry is, whether the debts were justly due as opposed to other debts, that were
 
 bona fide;
 
 that is, whether they were true debts, that arose entirely upon real contracts. And upon that essential point, the answer is, “ that the bonds were
 
 in part
 
 for money lent or advanced.” But what part, to whom it was paid, or when, is not disclosed; and for the other parts of the debts, besides the money, the answer assigns no cause but the bonds themselves. Five shillings lent or paid by Spencer, would satisfy the answer and save the defendants from the penalties of a false statement, touching the considerations of these b&nds. There is no suggestion that the price of board or of a horse was included in them. The defendants would not make that statement, and therefore they cannot ask the Court to give them the heneiit of remote probabilities, founded on the testimony of witnesses with imperfect information on the subject, when they, themselves, in whose knowledge the whole matter is, refuse, though demanded, to give any answer whatever. They do not even attempt to explain, why the bond for the small small sum of $54- 84 was taken so recently as December 15th, 1342, if, at that time, the pretended debtor owed the other large debt of
 
 ■$1,475 60, for
 
 which he gave a bond January 30th, 1843 ; nor is it intimated, that this large debt arose upon any intermediate transaction.
 

 The truth is, then, that there is not evidence, upon which a rational reliance can be placed, to sustain the debts of $54 84, and $1,475 80. The bonds themselves, being executed to a brother by an embarrassed man on the eve of insolvency, as alleged by the parties, and with a view to found
 
 *151
 
 on tliem an immediate conveyance of all his property, are entirely insufficient to establish tbe
 
 bona fides
 
 of the debt, and require the aid of extrinsic proof of the probable justice of it, which does not exist in this case. .
 

 The opinion of the Court on the foregoing point is sufficient
 
 to
 
 dispose of the cause. But we think it our duly to the cause of lair dealing and the justice due to creditors to say, that our opinion is equally strong against the defendants upon the other parts of the case. There are seldom collected more circumstances, than are here presented, of grave suspicion, that the deed and sale under it were not
 
 bona fide,
 
 with the intent to pay a debt, but, under color thereof, to provide for the grantor through favor of the preferred creditor; or, at all events, to defeat another creditor, as one of the primary motives for making the deed. The debtor and creditor are brothers; the trustee is a brother in law; the deed conveys every thing the grantor had on earth, down to his wife’s bed and his child’s cradle, and the most trifling articles, as old trunks 3 with a provision for an early sale, before the present plaintiff could recover his judgment; an actual sale in little more than two months, at which every thing was, without complaint on the part of the debtor, bought by the secured creditor at grossly inadequate prices ; and, with the exception of one negro woman, the former owner retained possession of all the property for about eight months after the sale, when the plaintiff was getting into a situation to seize it; and then some of it was sold to third persons and the residue partly spent by Spencer Alston and partly carried by Micajali out of the State. These facts, which are unquestionable, raise a conclusive presumption in a mind, at all familiar with real fair dealings among mankind, that the conveyance was made for the purpose of turning over the debtor’s property without an adequate consideration to his brother, thereby to defeat other creditors, and, probably upon a secret confidence for himself, to some extent at least. The subsequent pos
 
 *152
 
 session and enjoyment of tbe property by tbe debtor serves strongly to establish those intents. It is not now held to be conclusive of the fraud, as a matter of law it is true. Nevertheless, it is a very cogent sign of bad faith in every case, and in the present case is in the highest degree evidence of it. A person may naturally enough convey pro-' perty to secure a particular creditor, from whom he wishes forbearance, in the hope of paying the debt without a sale. So a person, who is insolvent, may probably assign his property with a view to an immediate sale, where a number of creditors are provided for, whose interest it will be to compete in bidding, so that the effects shall bring their value and exonerate the debtor as far as possible. Rut here is a case, which shews views of the parties of quite a contrary nature from either of the foregoing. There was but a single person provided for, and that by means of a deed authorizing a sale at a very short day. Why was that ? If the object was really to pay the debt, and nothing more, why did not the parties at once agree upon a sale, at a fair price, of enough for that purpose ? The reason for an assignment of the wholeproperty, instead of a sale of part, upon those terms, i s but too easily given. If there had been a sale at fair prices, there would have been a residue of the property left in the debtor, and exposed to execution. If it had been at grossly inadequate ¡Drices between brothers, it would have been easily questioned, and could not stand the trial, especially where the pretended debtor-retained tbe enjoyment after the alleged sale. But sales 'to tbe highest bidder have an appearance of fairness as to price, which renders it more difficult to ferret out a fraud in them; although it is obvious that a preferred creditor has a great advantage over other bidders, by not being obliged to advance money at the time, and if he can collude with the trustee, by fixing the time and place of sale; and the retaining of possession lor a period is-not so conclusive of a secret trust. The sale under a deed of trust may thus really be devised, as a better
 
 *153
 
 cover and mode of effecting a conveyance to the creditor at an under value, or in secret trust for the debtor. Such a motive for this deed, as it appears to the Court, must be inferred from the circumstances under which it was executed, its provisions in favor of a single person, and for so speedy a sale, the mode of conducting the sale, and the continued enjoyment by the debtor afterwards. Spencer Alston bought every thing; and, according to the evidence, at about half price, or less. That is beyond contradiction ; for, within that year, he sold four negroes for $1,237 50, for which he gave $620 ; and one of them he sold on the spot for $337 50, for which he gave $150. Now, this is said, in the answer, to have been a fair sale; and it is called so, because it was a public sale, and neither of the parties persuaded persons not to bid. The witnesses, for the same reasons, say, that as far as they are judges of such matters, it was fair. But they must estimate the morals involved in such cases, very loosely, if they hold this transaction fair. It is time, that sales by execution must be made before the return of the writ, without regard to price, because the mandate of the writ is peremptory. But the obligations of a trustee are not precisely like those of a Sheriff. He is selected by the parties, and is charged with the interests of both, and ought not to sell at an enormous sacrifice, as in this case — at all events, he ought not, unless under very special circumstances. Now, suppose the present plaintiff and the other creditors of Micajah Alston had been secured in this deed, instead of Spencer Alston; would Micajah have stood by, a silent and heedless spectator of a sale, at which the creditor was buying, without competition, at his own half prices, all the property he meant to take and keep ? Would he not certainly have urged the trustee to adjourn the sale to some time and place where bidders might be had ? And would not the trustee — ■ an impartial and fair man, not to speak of his being a brother-in-law — as certainly have done so
 
 1
 
 Then, why
 
 *154
 
 was not this sale stopped
 
 Í
 
 The answer is plain : the sale was going on precisely as the debtor, the creditor, and the trustee — ail three near relations — wished, and from the beginning intended it should. So far from complaining of the ruin brought on him, Micajah Alston said to one of his other creditors, who is the only one examined to the point, that, notwithstanding the sale then proceeding, he would pay his debt, and accordingly he still kept the property, and thus had the means of paying him, if he would. Micajah Alston was unquestionably willing that his brother should purchase at the prices he did, and that, the spectators felt and acquiesced in, rather than oíTend neighbors. It is impossible that Micajah Alston could have been willing to such a sale, if it had not been to his brother, and if he had not expected a benefit from it, and to defeat the present plaintiff. The witnesses may, perhaps, have meant, when they called it a fair sale, that it was so in respect of Micajah Alston, as he assented to it. But as respects that person’s creditors, it was not a fair sale, but a most unfair one — devised and conducted with the view of disposing of bis property, not at a fair price in satisfaction of a just debt, but, under cover of a sale for that purpose, to get the property, or much'of it, into the hands of his brother for his own use. It is true, these defendants deny, that there was any' agreement or understanding between them, that Spencer should purchase in trust for Micajah, or that he is bound or under promise to render him assistance ; and they say that sucb assistance is altogether voluntary. No doubt that is in form, -at least, true ; for there never is, upon such occasions, a plain and express declaration of trust, which, indeed, would defeat the objects in view by placing in the debtor an admitted interest,'that would plainly be subject to his debts. Therefore, the purpose always is, that the purchaser shall appear to be tbe exclusive owner, and that tbe rights of the grantor shall rest in mere personal confidence between the parties, and dependent
 
 *155
 
 upon the pleasure of the grantor. It is that very circumstance that constitutes the fraud, where it is collected that the deed was made, beeause the grantor thereby expected a profit or benefit to himself from such pleasure and favor of the grantee; while his creditors cannot reach that interest in any way. And the facts attending the sale, and the subsequent enjoyment of the property by She grantor, naturally reflect back on the previous parts of the transaction, and open to view the motives for making the deed.
 

 The deed must, for these reasons, be declared fraudulent and void, as against the plaintiff. As parts of the property have been sold by the defendant, ¡ápencei-, for more than sufficient to pay the plaintiff’s debt, and the residue removed beyond the process of the law, and Micajah Alston is insolvent, except in respect of this property, and has removed from the State, the plaintiff is entitled to a decree against the defendant, Spencer, directly, for payment of the principal, interest and costs of his judgment at law; which may be ascertained by an enquiry. We suppose this will be sufficient, as there is sao suggestion to the contrary. But, if the money should not be raised from him, liberty is reserved to the plaintiff to move for further directions in respect to the liability of the defendant, Allen. The defendants must pay the costs.
 

 Per Curiam.
 

 Decree accordingly.