YARBOROUGH v. HUGHES.

(Filed October 3, 1905).

*Contracts—Reformation and Cancellation—Attorney and Client—Trustees—Usurious Transaction—Documentary Evidence—Presumptions from Failure to Produce Evidence—Notice to Produce—Partial New Trial.*

1. Where the plaintiff's land was advertised for sale under a deed of trust and prior to the sale the defendant made a contract with the plaintiffs, agreeing to buy the land for himself with the stipulation that he would sell it to the plaintiffs for the amount of the purchase money paid by him, "with a reasonable advance thereon," as a profit to himself, the total sum to be divided into three installments, and when the installments were paid in full, the defendant should convey the land to the plaintiffs, the full agreement to be reduced to writing after the sale; and the defendant bought the land at the sale for $1,475, and he and the plaintiff entered into a contract containing substantially the above stipulations, except that it fixed the amount of the purchase money at $2,115, *held*, that the plaintiffs have no equity to cancel or to reform the contract, there being no suggestion that defendant occupied any fiduciary relation to them at the time, or that there was any fraud practiced, and no issue asked as to the reasonableness of the price.

YARBOROUGH *v.* HUGHES.

2. It is not reversible error for the court to refuse to give an instruction in response to a prayer, where it appears that it was afterwards given by the court in its charge.

3. Where the defendant trustee in a deed of trust was advised by his attorney that he could not buy at his own sale, and the attorney said that he could not represent him at all if he was expected to represent D, a prospective purchaser, but the attorney prepared the advertisement of sale as a courtesy to defendant, and after that became the attorney of D, having received a letter from the latter requesting that he act for him at the sale, and he further testified that he had completely severed his connection with the plaintiff as his attorney and represented D alone at the sale, it was proper for the court to refuse to instruct the jury that the attorney was in law the attorney of the defendant and D.

4. The profit realized by the defendant, even if excessive, would not amount to usury, unless it was a mere device to cover and conceal an usurious transaction, and this would depend upon the intent with which the increase was exacted and in the absence of a finding of unlawful intent, the transaction will not be declared usurious.

5. Where a party fails to introduce in evidence documents that are relevant to the matter in question and within his control, and offers in lieu of their production secondary or other evidence of inferior value, there is a presumption or at least an inference that the evidence withheld, if forthcoming, would injure his case.

6. Where the pleadings themselves are notice to a party of the importance of certain writings in his possession, as evidence, notice to produce is not necessary. The failure to produce on notice merely increases the strength of the presumption or inference, or adds weight to the evidence, if any, offered by the other side as to their contents.

7. Where two issues are independent of and clearly severable from the others, it presents a proper case for the exercise of the discretion of this court to restrict the new trial to said two issues.

ACTION by A. L. Yarborough and others against W. T. Hughes and M. L. T. Davis, heard by *Judge W. B. Councill* and a jury, at the April Term, 1905, of the Superior Court of

FRANKLIN County. From a judgment for the defendants, the plaintiffs appealed.

This action was brought to set aside a sale of land made by the defendant, W. T. Hughes, under the power given in a contract between him and the plaintiffs, dated April 26, 1902, the other defendant, M. L. T. Davis, having purchased the land at the sale and received a deed therefor from his co-defendant.

Plaintiffs alleged that the defendants were jointly inter-ested in the contract containing the power, although on its face it appears to have been made by them with W. T. Hughes alone, and that the sale under the power was in fact and in law conducted by W. T. Hughes, through his attorney, and the land bid in by the same attorney in the name of Davis, but really for the use and benefit of Hughes or for the joint benefit of Hughes and Davis, who were at the time co-partners in trade.

The facts necessary to be stated for an understanding of the case are these: Joseph Branch, an ancestor of the plain-tiffs, other than the husbands of those who are married and the widow of Branch, was at his death the owner of the land, and after his death his heirs to whom it had descended (or some of them who had received a deed from J. M. Allen, pur-chaser at the administrator's sale under a prior agreement with him), conveyed it to F. S. Spruill, as trustee, to secure certain debts of Jos. Branch, and perhaps some other debts, with power of sale in case of default. Mr. Spruill sold the land in accordance with the terms of the deed of trust and W. T. Hughes became the purchaser at the price of $1,475. Plaintiffs allege that before this sale Hughes had agreed to buy the land in for them, and that the transaction should be treated either as a loan of the amount of the purchase money or as a purchase by him for them, with the right to redeem or buy it back on paying the amount of the bid and interest; but a written contract, dated March 22, 1902, was put in evi-

dence; the substance of which was that Hughes agreed to buy
the land for himself with a stipulation that he would sell it
to the plaintiffs for the amount of the purchase money paid
by him "with a reasonable advance thereon" as a profit to
himself, the total sum to be divided into three equal instal-
ments, one of which was to be paid each year for the next
three years as rent, and it was further agreed that when the
three instalments were paid in full, Hughes should convey the
land to the plaintiffs.     There was a stipulation in the con-
tract for a lien on the crops and a clause of forfeiture and a
power of sale if default was made in the payment of any one
of the instalments of rent or purchase money.     It was further
provided that the full agreement should be reduced to writing
after the sale by Mr. Spruill, as trustee, which was then ad-
vertised for April 7, 1902.     There was also in evidence a
written agreement purporting to be the one provided for in
the paper writing just mentioned.     It contained substantially
the same stipulations, except that it fixed the amount of the
purchase money at $2,115, to be divided into three equal in-
stalments and paid as above provided.     There were other
terms, not necessary to be mentioned.     This contract was duly
acknowledged by all of the parties before the clerk.     Plain-
tiffs alleged that they had made certain payments on the debt
to Hughes, reducing the amount of it to $1,185.08.     They
having defaulted in the payment of the instalments according
to the contract, Hughes advertised and sold the land under
the power and it was purchased by his co-defendant Davis.
Issues were submitted to the jury and the answers thereto
were as follows: 1.  Hughes paid Spruill, trustee, for the
land, $1,475.   2.  Plaintiffs paid to Hughes in 1902 over and
above supplies furnished to them by him $516.85.   3.  The
annual rental value of the land is $225.   4.  The value of the
wood cut and removed by defendants $10.   5.  The land
brought at the sale by Hughes under the power, December 22,
1902, $1,692.   6.  Defendants were not mutually interested

in the purchase of the land at the sale of April 7, 1902, by F. S. Spruill. 7. Defendants were not mutually interested in the purchase of the land at the sale of December 22, 1902. And (reversing the order of the last two issues), 8. Davis was represented by Mr. Ruffin, as attorney, at the sale of December 22, 1902. 9. The said attorney did not represent Hughes at that sale. Judgment was entered for the defendants upon this verdict, and the plaintiffs excepted and appealed.

*W. M. Person* and *T. T. Hicks* for the plaintiffs.
*F. S. Spruill* for the defendants.

WALKER, J., after stating the case: We may assume for the sake of the argument, if not for all purposes, that the written agreement between the plaintiffs and Hughes, dated April 26, 1902, is a contract to sell or to make title upon payment of the purchase money and compliance with the other stipulations, notwithstanding that it has some of the usual terms of a lease expressed in it. *Puffer v. Lucas,* 112 N. C., 377; *Clark v. Hill,* 117 N. C., 11; *Mfg. Co. v. Gray,* 121 N. C., 168; *Hervey v. Locomotive Works,* 93 U.S., 664. The plaintiffs therefore had the right, or, after default, the equity to redeem the premises by paying the purchase money and in other respects complying with the agreement, and the defendant Hughes had the right to foreclose by sale when there was any default. The contention of the plaintiffs thus far may be admitted, and the case was really tried on the plaintiffs' theory. They have therefore substantially had the full benefit of the principle involved in their second prayer. The plaintiffs' allegation that Hughes bought upon the promise that he would convey to them on payment of the amount of his bid and interest, is not sustained. There was no issue upon this allegation, and indeed it seems to have been abandoned or at least waived for the present. They further claim

that the contract of April 26, 1902, was onerous, oppressive and therefore inequitable, and that the court should not enforce it. There was no issue asked or submitted which presented this contention. By the agreement of March 22, 1902, Hughes was to buy at the approaching sale and convey to plaintiffs upon payment of his outlay and a reasonable advance thereon, which it was agreed should be the purchase price to be paid in three equal instalments. We do not see why he did not have the right to make this contract with the plaintiffs, or how it was onerous or unconscionable for him to do so. They had no money and requested him to bid in the land, as he had money for the purpose. He was to buy for himself, so says the contract, and to sell to them for a reasonable profit on the transaction. There is no suggestion that he stood in any position of trust or confidential relation to them at the time, or that there was undue influence used or any fraud practiced to obtain the contracts. Defendants agreed in the preliminary contract to pay a fair and reasonable amount over and above his bid, and by the contract executed in April they virtually affirmed that the amount fixed was reasonable. Nothing else appearing we are unable to hold that the plaintiffs have any equity to cancel or to reform the contract or to pay a less sum than it calls for. They asked for no issue as to the reasonableness of the price charged by Hughes, and we must conclude that this matter was fairly and finally adjusted by the parties in April, in accordance with their previous understanding as evidenced by the agreement made in March. If the price was reasonable and there was no fraud or other vitiating element, the contract must stand both in law and in equity. The first, third and sixth prayers of the plaintiffs were therefore properly refused.

Upon the sixth and seventh issues, the plaintiffs requested the court to charge the jury that they might consider the manner of keeping the accounts by defendants, it appearing that certain items paid by plaintiffs on the debt were entered on

the books in the name of W. T. Hughes & Co., and that a re-
ceipt for rents was given to David Perry, one of the plaintiffs,
in the name of the firm, and the supplies entered as furnished
by the firm, which was composed of W. T. Hughes and
M. L. T. Davis. This instruction, it appears, was not given
in response to plaintiffs' prayer, but by referring to the
charge we find that it was afterwards given by the court, and
the contentions of the parties and the evidence bearing there-
on fully explained to the jury. There was therefore no rever-
sible error in refusing to give that part of the instruction em-
braced by the seventh prayer of plaintiffs, which related to
this matter.

Before considering the remaining portion of this prayer,
we will dispose of two other exceptions, as it is more con-
venient to treat of them in this order.

In the fourth prayer the plaintiffs requested the court to in-
struct the jury that the testimony of the attorney, if believed,
constituted him in law, at the time of the sale of December
22, 1902, the attorney of Hughes and Davis, and for that rea-
son the sale was void and passed no title. The testimony was
to the effect that Hughes told his attorney that there would be
a default, and that if there was he would sell the land. The
attorney then advised him that he could not buy at his own
sale, as Hughes had intimated that the land might not bring
the amount of the debt and he would have to bid it in.
Hughes then suggested the names of several parties who
would bid, and he was told by his attorney that he could not
buy directly or indirectly, and that it must be some one not
interested in the sale. Hughes then said Mr. Davis had
money for investment and that he would suggest to him not
to let the land be sold at less than its value. The attorney
then said that he could not represent him at all, but that he
must go there and make the sale himself, and added that if he
was expected to represent Mr. Davis, he could not conduct
the sale, as he could not, being attorney for Hughes, make a

bid for anybody else. He then prepared the advertisement of sale, as a courtesy to Hughes, and after that became the attorney of Davis, having received a letter from the latter requesting that he act for him at this sale, limiting his bid to $1,700, and promising to remit the cash should he become the purchaser. It is not necessary to recite all the other testimony on this point. It will suffice to add that the witness further testified, in substance that he had completely severed his connection with Hughes, as his attorney, and represented Davis alone at the sale. The jury accepted this version of the transaction, as they found that the witness did not act for Hughes at the sale, but solely for Davis. There being evidence to sustain the verdict, it must be an end of the matter.

As we construe the evidence, the conduct of the attorney was perfectly correct both in law and in fact. When it appeared to him from what Hughes said that he expected him to represent him at the sale, he promptly advised him of the law on the subject, and of the impropriety of his acting in a dual capacity and representing opposing, if not conflicting interests, and immediately divested himself of all obligation to Hughes as his attorney and ceased to act for him. It was a question of fact to be determined by the jury under the proper guidance of the court. The exceptions to the refusal of the court to give the instructions contained in the fourth and fifth prayers are therefore overruled.

After the verdict had been returned, the plaintiffs requested the court to adjudge upon the verdict that the defendant Hughes had received from the plaintiffs $730.85 of unlawful and usurious interest and that judgment be entered for double that amount. This prayer was properly refused by the court. The contract of March 22, 1902, expressly provided that Hughes should buy the land at the sale of April 7, and sell it to the plaintiffs upon the terms we have already set forth. He was to receive a reasonable advance on the amount of his bid, the total amount to be divided into three

equal instalments to be paid as stipulated. Afterwards, on April 26, 1902, the plaintiffs freely, voluntarily and solemnly agreed, without any serious allegation, and certainly no issue, as to fraud or undue influence in procuring the instrument, or other equitable element to vitiate the contract, or to prevent its full operation, that they would pay $2,115 for the land, and there is evidence tending to show that they had proposed to pay Hughes $2,400 for the land, he replying to this proposal "that $2,100 and the costs was all he wanted." There is further evidence that they importuned him to buy and then sell to them, and that Hughes had at the time been offered $2,000 in cash for the land. The only question was whether the price fixed in the contract was a reasonable advance on the bid, and we do not well see how this question could be raised, as they had agreed in writing that it was, and had promised to pay it. If there was no ground upon which to assail that agreement and have it reformed and set aside, it must be binding upon them, and no equity for either reforming or cancelling the agreement has been established by the verdict. The profit realized by Hughes, even if excessive, would not amount to usury, unless it was a mere device to cover and conceal an usurious transaction. It is less difficult to decide what is usury, when there is a loan of money, than in a case like this one. Interest is the premium allowed by law for the use of money, while usury is the taking of more for its use than the law allows. It is an illegal profit. 4 Blk., 156. How can we say, on the face of this transaction, that as a matter of law it is usurious? If it was a reasonable advance, it surely cannot be illegal, for it was not excessive, and even if exorbitant it must have been resorted to as a mere cloak for usury. It would therefore depend upon the intent with which the increase was exacted. Referring to a state of facts much like those in this record, Tyler, in his work on Usury, p. 92, says: "The inquiry often arises whether the transaction was a real sale in the regular course of business

or a colorable sale, with intent to disguise a loan and evade the statute against usury; but if the case is found to be a sale and not a loan, the courts uniformly hold that usury cannot attach, and indeed a sale can in no case be *prima facie* evidence of usury; for it is valid unless it be a loan in disguise, and the burden of proof lies on the party claiming it to be usury, and it is necessary for him to show the circumstances which bring it within the statute." In cases like this, the intent is the essential element of usury, and this is of course a question of fact to be decided by the jury under proper instructions from the court. In this case the unlawful intent is not found.

We now come to the consideration of the exception to the refusal of the court to give the latter portion of the seventh prayer, which is as follows: "The jury may consider the fact that the writings, if any, by which the land was paid for at or after both sales are presumably in possession of defendants, and would throw light on the nature of the transaction, and as tending to show that such writings, if produced, would make against the defendants on said issues," referring to the 6th and 7th. This exception has presented more difficulty than any other. The plaintiffs notified the defendants to produce the papers described in the prayer, but the notice was not served on Davis, and was served on Hughes late in the trial. If the correctness of the prayer depended upon the serving of notice, we might, perhaps, overrule the exception on account of the lateness of the time of service. But we do not think it does. The answer itself was sufficient notice to the defendants of the importance of these writings, as evidence, to them. It is the failure to introduce testimony, oral or written, which should be valuable to a party, that raises the inference against him that, if introduced, it would be detrimental to his case. The relevancy and weight of such a fact as evidence is established by one phase of the maxim *omnia praesumuntur contra spoliatorem,* which is said to rest

upon logic, and the presumption it raises to be reinforced by our every day experience that men do not as a rule withhold from a tribunal facts beneficial to themselves. It is therefore laid down in the books as a well settled principle that where a party fails to introduce in evidence documents that are relevant to the matter in question and within his control, and offers in lieu of their production secondary or other evidence of inferior value, there is a presumption or at least an inference that the evidence withheld, if forthcoming, would injure his case. The failure to produce on notice, merely increases the strength of the presumption or inference, or adds weight to the oral evidence, if any, offered by the other side as to their contents. Some of the authorities say that the presumption does not constitute independent and substantive evidence of a fact, but we need not decide how this is. The same rule applies to the failure to call an available witness with peculiar knowledge of the fact to be established. The subject is fully and clearly treated in 16 Cyc. of Law, pp. 1059-1065. It has been applied in our courts to the case of a litigant in a civil action who fails to appear as a witness in his own behalf and who is fixed with a knowledge of the facts. *Goodman v. Sapp*, 102 N. C., 477, and cases therein cited, which illustrate the application of this rule of evidence. In *Attorney-General v. Dean of Windsor*, 22 Beav., 706, it is said that evidence is always to be taken most strongly against a person who keeps back a document. Broom, in his Legal Maxims, says (8 Am. Ed.), p. 938: "If a man by his own tortious act withhold evidence by which the nature of his case would be manifested, every presumption to his disadvantage will be adopted, for where a party has the means in his power of rebutting and explaining the evidence adduced against him, if it does not tend to the truth, the omission to do so furnishes a strong inference against him." And again: "This rule is founded on a sort of presumption that there is something in the evidence withheld which makes against the party not producing it,"

and he puts the case of the nonproduction of a deed or other written instrument. Broom, *supra*, p. 940. See also 3 Elliott on Evidence, section 1967; 1 Greenleaf on Ev., 16 Ed., section 37, note 1, and section 195c, and note 1. The text writer last cited says that the conduct of the party withholding the evidence is attributed to his supposed knowledge that the truth would have operated against him, and the nonproduction of the evidence is a significant fact for the consideration of the jury. This court applied the rule in *Black v. Wright*, 31 N. C., 451, saying that it is classed among the strongest circumstantial proofs against a person that he omits to introduce evidence which should properly come from him. *State v. Atkinson*, 51 N. C., 67; analogous cases are *Hawkins v. Alston*, 39 N. C., 147; *Satterwhite v. Hicks*, 44 N. C., 109. The court refused to apply the rule in *Gudger v. Hensley*, 82 N. C., 486, (affirmed in *Scott v. Elkins*, 83 N. C., 426,) in regard to lists supposed to have been annexed to the Blount grant, but for the reason that the proof showed that they were inaccessible. Authorities applying the rule of presumption upon the ground that the document, if produced, would probably militate against the party who withholds it or could produce it, are *Westfelt v. Mfg. Co.*, 69 N. E. Rep., 169, *Darby v. Roberts*, 22 S. W. Rep., 529. It is also applied in *Johnson v. Levy*, 109 La., 1038, where the principle is stated to be that when effective proofs are within the reach of a party and he fails to produce them, a presumption is raised that they would, if produced, make against him. This is very nearly the language of the prayer in this case. Usually the nonproduction of papers called for in a notice has no other legal effect than to allow the opposite party to prove their contents, but when a party, under the obligation to sustain his defense by proof, has possession of the best evidence and fails to produce it but attempts to sustain it by inferior evidence, it authorizes the inference that he does not furnish the best, because it would injure instead of benefiting his

cause. *Ins. Co. v. Evans,* 9 Md., 1. Strongly supporting the maxim in its general application will be found the cases of *Clifton v. U. S.,* 4 How., 242, and *Runkle v. Burnham,* 153 U. S., 216; *Roe v. Harvey,* 4 Burrows (opinion by *Lord Mansfield*), 2484. There surely was evidence in this case for the jury upon the question whether Hughes and Davis were jointly interested in the land and in the purchase at the sales, and it was so considered in the trial at the court below, as will appear from the charge, in which His Honor so lucidly stated the contentions of the respective parties and arrayed the evidence in support of them. The case was such as to call for a full disclosure by the defendants through the medium of the best attainable evidence. We think the instruction as to the nonproduction of the papers should have been given. It may be that the defendants will be able to show that, after due and diligent search prosecuted in good faith, they are unable to produce them or they may in some other manner explain away any inference to be drawn from the failure to offer them in evidence. If there is a fair, frank and satisfactory explanation, the presumption may be laid out of the case and the defendants will not be deprived of any right to which they are otherwise entitled; if, however, no satisfactory explanation is forthcoming, the maxim of the law will apply, and the jury must pass upon the case, aided by the presumption, giving to it such force and effect as they may think it should have under all of the facts and circumstances. The Pizarro, 2 Wheat., 227; *State v. Phifer,* 90 N. C., 721. The court erred in not giving the said instruction, for which there must be a new trial, but it will be confined to the sixth and seventh issues, as we deem this a proper case for the exercise of our discretion to restrict the scope of the new trial. The other issues are independent of these two and clearly severable from them. If the jury find for the plaintiffs upon the sixth and seventh issues, or, perhaps, upon either of them,

further proceedings must be had to adjust and enforce the plaintiffs' equity. If the decision is the other way and is free from error, it will put an end to the case.

New Trial.