IN THE SUPREME COURT OF NORTH CAROLINA

No. 68A25

Filed 22 May 2026

RELATION INSURANCE, INC. and RELATION INSURANCE SERVICES OF NORTH CAROLINA, INC.

v.

PILOT RISK MANAGEMENT CONSULTING, LLC, PILOT FINANCIAL BROKERAGE, INC. d/b/a PILOT BENEFITS, KYLE SMYTHE, ROBERT CAPPS, LYNETTE KINNEY, EDWARD MILES GURLEY, SEAN KELLY, TYLER CROOKER, MICHELLE LINTHICUM, LINDA MICHELLE SNEED, TONI KING, and JOHNATHAN LANCASTER

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion entered on 25 July 2024 and an order clarifying that order and opinion entered on 1 August 2024 by Judge Mark A. Davis, Special Superior Court Judge for Complex Business Cases, in Superior Court, Guilford County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(a). Heard in the Supreme Court on 18 September 2025.

*Fox Rothschild LLP, by Kip D. Nelson and Ashley B. Chandler, for plaintiff-appellants.*

*Gavin J. Reardon and Amiel J. Rossabi for defendant-appellees.*

BARRINGER, Justice.

For the reasons stated herein, we affirm in part, reverse in part, and remand the Business Court's orders for further proceedings not inconsistent with this opinion.

## I. Background

Relation Insurance, Inc. is a holding company for Relation Insurance Services of North Carolina, Inc. (collectively, plaintiffs or Relation). Relation Insurance, Inc. has multiple subsidiaries located in other states. Relation Insurance Services of North Carolina, Inc. operates out of an office in Greensboro, North Carolina.

According to its own contracts, Relation is an "independent insurance agency and broker engaged in the business of the sale, marketing and provision of various insurance products and services to individuals and institutional, governmental and business clients[.]" As Relation's president put it, Relation "serves as an intermediary between insureds and insurance carriers." As an intermediary, Relation negotiates, places, and services the insurance coverage best suited to meet the specific needs of each policyholder.

According to affidavits filed, salespersons at Relation are known as "producers," who "are individuals licensed to sell, service, and negotiate insurance products and services, including insurance policies." Meanwhile, "account managers" at Relation are employees who "work alongside producers to manage client relationships and service accounts in more of a customer service role." Account managers are salaried employees who do not rely on commission. The same is not true of producers. The salary of producers is tied to commission—especially those experienced producers who have built sizeable books of business. Historically, Relation's compensation models increased alongside the size of a producer's book of

business.

However, by 2019, Relation shifted its commission rate model for producers. Rather than varying the rate based upon the size of the producer's book of business, Relation implemented "a standard 25/40% split." Yet, in implementing its new commission model, Relation failed to inform all the producers of the change. Relation's failure to inform gave rise to discontent among its employees. At the Greensboro office, Relation employees lodged complaints about the company's lack of transparency and overburdensome workload.

In early 2020, defendant Kyle Smythe, who at the time was employed as a Relation producer, left Relation. Smythe formed a new insurance agency, defendant Pilot Risk Management Consulting, LLC (Pilot Risk). Smythe, defendant Robert A. Capps III, and defendant Lynette Kinney are members of Pilot Risk. In addition, Capps and Kinney are "part-owners" of defendant Pilot Financial Brokerage, Inc. d/b/a Pilot Benefits (Pilot Benefits).[1] By March 2020, Pilot began operations as "a direct competitor of Relation" in the insurance agency business.

Soon after Pilot opened its doors, Relation filed a prior lawsuit in Superior Court, Guilford County (the Smythe Lawsuit). Relation brought claims against Smythe for breach of his employment agreement, tortious interference, and unfair and deceptive trade practices. On 4 September 2020, the trial court entered an

---

[1] For purposes of this opinion, Pilot Risk and Pilot Benefits are collectively designated as "Pilot."

interlocutory order dismissing all of Relation's claims in the Smythe Lawsuit, except for the breach of employment agreement claim (the Smythe Order). On 11 March 2021, the Smythe Lawsuit was settled through a settlement agreement (the Settlement Agreement). The Settlement Agreement was entered into with Relation by Smythe, Capps, Kinney, and Pilot. Smythe, Capps, Kinney, and Pilot are named defendants in this case.

Not long after Smythe left Relation, matters worsened for Relation's disgruntled employees. On 1 April 2020, Relation conducted a conference call for all of its employees. On the call, Relation informed its employees that the company would be instituting a freeze on all pay raises in response to the COVID-19 pandemic. This new pay freeze ultimately triggered an exodus of Relation employees beginning in the fall of 2021.

During this period, seven employees left Relation's Greensboro office for Pilot. These seven employees are the remaining defendants in this case: Edward Miles Gurley, Sean Kelly, Tyler Crooker, Johnathan Lancaster, Michelle Linthicum, Linda Michelle Sneed, and Toni King (collectively, the Former Employees). Gurley, Kelly, Crooker, and Lancaster were employed as producers at Relation. Linthicum, Sneed, and King were employed as account managers.

The Former Employees' tenures with Relation differed, with some having spent four years at the company and others as many as ten. Prior to beginning their employment with Relation, each of the Former Employees signed an employment

agreement (the Employment Agreements).[2] The Employment Agreements contained non-solicitation provisions, which prohibited the solicitation of Relation's clients or employees upon an employee's departure from Relation.

The Former Employees transitioned from Relation to Pilot during approximately a three-month period, which began in late 2021 and finished in early 2022. The first of the Former Employees to leave was Crooker, who resigned on 30 November 2021 and began working for Pilot on 3 December 2021. Sneed quickly followed, resigning from Relation on 1 December 2021 and beginning at Pilot on 6 December 2021. King accepted a position with Pilot on 17 February 2022, even though she did not resign from Relation until eight days later. Both Kelly and Gurley accepted positions at Pilot on 18 February 2022 and resigned from Relation that same day. Also on 18 February 2022, Linthicum resigned from Relation. Pilot hired Linthicum three days later. On 25 February 2022, Relation terminated Lancaster. Pilot assigned Lancaster a Pilot email address that same day.

During this three-month period of departures, the Former Employees sent numerous messages to each other, as well as to their old Relation clients. In addition, each Former Employee forwarded various documents from their Relation email account to their personal email accounts, which Relation contends violated the

---

[2] At the time that each Former Employee signed his or her employment agreement, Relation Insurance, Inc. was known as "Ascension Insurance, Inc." As such, the Employment Agreements use "Ascension Insurance, Inc." rather than the present-day name of "Relation Insurance, Inc."

Employment Agreements and amounted to misappropriation of trade secrets in some instances.

On 11 April 2022, plaintiffs filed their complaint, initiating the current action in Superior Court, Guilford County, after which the case was designated a mandatory complex business case. On 5 July 2022, defendants filed various counterclaims against plaintiffs. After the close of discovery, the parties filed cross-motions for partial summary judgment on 28 July 2023. Plaintiffs also filed a motion for adverse inference on 31 August 2023.

On 12 July 2024, the Business Court filed its Order and Opinion on Defendants' Motion for Partial Summary Judgment, Plaintiff's Motion for Partial Summary Judgment, and Plaintiffs' Motion for Adverse Inference at Summary Judgment and Trial Based on Spoliation of Evidence (the Summary Judgment Order) granting in part and denying in part the cross-motions for partial summary judgment. *See Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC*, No. 22 CVS 4285, 2024 WL 3549145 (N.C. Super. Ct. July 12, 2024). In the Summary Judgment Order, the Business Court additionally granted plaintiffs' motion for adverse inference. *Id.* at *15. Approximately two weeks later, on 1 August 2024, the Business Court filed an Order Clarifying 12 July 2024 Order and Opinion (Clarifying Order) dismissing several of plaintiffs' other claims. Plaintiffs now appeal both orders.

As an initial matter, the orders did not dispose of all claims and defenses. As such, plaintiffs appeal interlocutory orders. *Veazey v. City of Durham*, 231 N.C. 357,

362 (1950) ("An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy.").

"The general rule is that 'there is no right of immediate appeal from interlocutory orders and judgments.'" *Land v. Whitley*, 388 N.C. 296, 298 (2025) (quoting *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 725 (1990)). However, there are exceptions to the general rule. *See* N.C.G.S. §§ 1-277, 7A-27(a)(3), (b)(3) (2025); N.C.G.S. § 1A-1, Rule 54(b) (2025); *see also Land*, 388 N.C. at 298 (recognizing the same).

The interlocutory orders, here, are appealable to this Court pursuant to N.C.G.S. §§ 1-277(a) and 7A-27(a)(3), because the orders dismissed some of plaintiffs' claims against certain defendants in full. The claims that remain will require a jury to resolve issues of fact that will later implicate claims against those defendants the court dismissed. This could lead to inconsistent verdicts. As such, the orders affect a substantial right. *See Hamby v. Profile Prods., LLC*, 361 N.C. 630, 634 (2007) ("This Court has recognized that a substantial right is affected if the trial court's order granting summary judgment to some, but not all, defendants create the possibility of separate trials involving the same issues which could lead to inconsistent verdicts.").

Given the interlocutory nature of plaintiffs' appeal, our review is limited to only those claims dismissed by the summary judgment orders and the motion for adverse inference.

## II.    Standard of Review

"The evidence proffered at summary judgment must be taken in the light most favorable to the nonmovant." *Hinman v. Cornett*, 386 N.C. 62, 65 (2024). "The moving party has the burden of establishing the absence of any triable issue . . . by proving that an essential element of the opposing party's claim is nonexistent or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim." *Zimmerman v. Hogg & Allen, Pro. Ass'n*, 286 N.C. 24, 29 (1974).

"If the moving party meets this burden, the party who opposes the motion for summary judgment must either assume the burden of showing that a genuine issue of material fact for trial does exist or provide an excuse for not so doing." *Id.* "If a genuine issue of material fact does exist, the motion for summary judgment must be denied[.]" *Id.*; *see also* N.C.G.S. § 1A-1, Rule 56(c) (2025). A trial court's summary judgment ruling receives de novo review. *Hinman*, 386 N.C. at 65.

## III.    Analysis

### A. Motion for Adverse Inference

Shortly after the Former Employees left Relation for Pilot, Relation sent cease-and-desist letters to each defendant. The letters included a preservation notice, advising each individual defendant "to preserve any and all information relevant to the facts surrounding the topics in this letter." Plaintiffs then filed their complaint in this action. Two days later, plaintiffs filed a motion for preliminary injunction. In that

motion, plaintiffs requested that the Business Court order defendants to preserve all data and materials stored on defendants' various electronic devices.

The same day that the motion for preliminary injunction was filed, Linthicum reset her cell phone. Throughout the following week, Smythe, Lancaster, Capps, King, and Sneed also reset their cell phones. Two weeks after that, Gurley "wiped" his personal computer. Then after that, Lancaster switched out the SIM card in his cell phone. Kinney subsequently reset her phone.

At a discovery dispute conference, the Business Court informed the parties that a forensic analysist in the field of information technology would be permitted to conduct digital imaging of defendants' electronic devices beginning on 25 October 2022. The prospect of digital imaging sparked more deletions by defendants. Gurley reset his phone the same day as the conference. The next day, Smythe and Crooker deleted cell phone data files from their laptop computers. Sneed reset her laptop computer. Kelly reset his cell phone. Linthicum installed a new SIM card on her phone. And files were deleted from Gurley's laptop on two separate occasions.

In response to the deletions, plaintiffs filed their motion for adverse inference with the Business Court. The Business Court granted plaintiffs' motion, finding that plaintiffs had "met their burden of establishing that the [i]ndividual [d]efendants intentionally destroyed or failed to preserve potentially relevant evidence despite being aware of either actual litigation or the possibility of future litigation." *Rel. Ins.,*

*Inc.*, 2024 WL 3549145, at \*15. We do not disturb the Business Court's grant of plaintiffs' motion for adverse inference. However, we do take issue with its application to the Summary Judgment Order and Clarifying Order before us.

Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence. This Court has articulated the rule as follows: "where a party fails to introduce in evidence documents that are relevant to the matter in question and within his control, . . . there is a presumption or at least an inference that the evidence withheld, if forthcoming, would injure his case." *Yarborough v. Hughes*, 139 N.C. 199, 208–09 (1905). "The rule is founded on a sort of presumption that there is something in the evidence withheld which makes against the party not producing it." *Id.* at 209 (extraneities omitted). Application of the rule provides "a significant fact for the consideration of the jury," *id.* at 210, and "is classed among the strongest circumstantial proofs" against the party that withholds evidence in its possession, *id.* (citing *Black v. Wright*, 31 N.C. (9 Ired.) 447, 451–52 (1849)).

"The [adverse] inference is not mandatory, but lies within the province of the trier of fact." *Sunset Beach Dev., LLC v. AMEC, Inc.*, 196 N.C. App. 202, 220 (2009). Where the trial court finds that such an inference is appropriate, it is within that court's "broad discretion" to shape the contours of the inference's application by jury instruction. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); N.C.G.S. § 1A-1, Rule 51 (2025). Herein lies the difficulty for this Court sitting in review.

The spoliation of evidence in this case is remarkable. As the forensic analyst opined, "in his 35+ years of experience, he has never seen such extensive and coordinated deletions of evidence across so many electronic devices as he discovered in his forensic examination in this matter. The deletions have destroyed what the full picture of data would have been in this case." (Extraneities omitted.) Indeed, the Business Court found as a fact that "there are multiple instances in the record of [d]efendants deleting materials from their devices or completely 'wiping' their devices[,]" with the subject matter of at least some of the deleted material "directly address[ing] issues raised in this case." *Rel. Ins., Inc.*, 2024 WL 3549145, at *14.

The extensive spoliation of evidence renders meaningful review of many factual questions in this case exceedingly difficult. After granting plaintiffs' motion for adverse inference, the Business Court failed to identify with specificity where and how the inference should be drawn, leaving its scope unclear. As such, we remand the issue of spoliation for the Business Court to clarify, with greater precision, its application of the inference as to each claim. On remand, the Business Court should provide the parties to this case with its adverse inference instruction and specifically detail in its orders where the inference applies. With the Business Court's discretionary function more fully exercised, the parties (and *if necessary*, a court sitting in review) will be better equipped to understand its application.

Mindful of the adverse inference issue, we now address the legal questions properly presented on appeal.

## B. Misappropriation of Trade Secrets

Plaintiffs brought misappropriation of trade secrets claims under both the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1832–1839, and the North Carolina Trade Secrets Protection Act (NCTSPA), N.C.G.S. §§ 66-152 to 66-157 (collectively, the Acts). To bring a claim under the Acts, a claimant must sufficiently demonstrate that the information constitutes a "trade secret" and that the trade secret was subject to "misappropriation."

### 1. *Definition of "Trade Secret"*

The DTSA defines a "trade secret" as follows:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).[3]

---

[3] Moreover, the DTSA carves out information obtained by "reverse engineering, independent derivation, or any other lawful means of acquisition" from its trade secret definition. 18 U.S.C. § 1839(6)(B). This carve-out mirrors the NCTSPA definition.

The NCTSPA defines a "trade secret" as follows:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3) (2025). In determining whether information constitutes a trade secret, North Carolina and federal courts consider six factors:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 278 (2019) (extraneities omitted); *see also TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 591–92 (2014); *Sterling Title Co. v. Martin*, 266 N.C. App. 593, 601 (2019); *Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 525 (2003); *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 369–70 (2001); *State ex rel. Utils. Comm'n v. MCI Telecomms. Corp.*, 132 N.C. App. 625, 634 (1999); *Wilmington Star-News, Inc. v. New*

*Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 180–81 (1997); *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 188 (1st Cir. 2023).

These factors derive from the First Restatement of Torts. *See* Restatement (First) of Torts, § 757 (A.L.I. 1939). Rather than operating as a six-part test, the factors serve as an instructive guide for ascertaining whether a trade secret exists. *See SCR-Tech LLC v. Evonik Energy Servs. LLC*, No. 08 CVS 16632, 2011 WL 3209080, at \*10 (N.C. Super. Ct. July 22, 2011); *see also IVS Hydro, Inc. v. Robinson*, 93 F. App'x 521, 527 (4th Cir. 2004) (unpublished); *Learning Curve Toys, Inc. v. PlayWood Toys Inc.*, 342 F.3d 714, 722 (7th Cir. 2003); *In re Bass*, 113 S.W.3d 735, 740 (Tex. 2003); *Minuteman, Inc. v. Alexander*, 434 N.W.2d 773, 777 (Wis. 1989); *Basic Am., Inc. v. Shatila*, 992 P.2d 175, 184 (Idaho 1999).

The Business Court below noted that the parties had not identified "any differences in the analysis to be applied to a claim under the DTSA as compared to one under the NCTSPA." Thus, the Business Court determined it proper to address plaintiffs' DTSA and NCTSPA claims "in tandem." *Rel. Ins., Inc.*, 2024 WL 3549145, at \*16. We agree with this approach and do the same. Indeed, "trade secret law varies little from state to state and is generally governed by widely recognized authorities such as the Restatement of Unfair Competition and the Uniform Trade Secrets Act." *TianRui Grp. Co. v. Int'l Trade Comm'n*, 661 F.3d 1322, 1327–28 (Fed. Cir. 2011).

As a preliminary matter, to even claim information is a trade secret, a plaintiff must first "identify a trade secret with sufficient particularity so as to enable a

defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609–10 (2018) (quoting *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326 (2008)). Once identified, courts will then determine whether the requirements for a trade secret, as defined by statute, have been met. *Id.* at 610.

Below, plaintiffs identified several documents with sufficient particularity to bring their trade secrets claims. However, the Business Court found that three documents did not qualify as protectable trade secrets under the Acts. Plaintiffs appeal two of those documents: Gurley's Customer List and the Client Renewal List. Both documents are Excel spreadsheets containing various information about plaintiffs' clients. In other words, each constitutes a client list.

So long as the information meets each of the Acts' statutory requirements, client lists can qualify as a trade secret. *Id.* at 610; *James B. Oswald Co. v. Neate*, 98 F.4th 666, 676 (6th Cir. 2024). A client list, however, will not qualify as a trade secret where the record indicates that the list could have been compiled "through public listings such as trade show and seminar attendance lists." *Krawiec*, 370 N.C. at 610 (quoting *Combs & Assocs.*, 147 N.C. App. at 370). Similarly, a client list will also not qualify as a trade secret where there is no evidence "that the company took any special precautions to ensure the confidentiality of its customer information and any information used to contact the clients would have been easily accessible . . . through

a local telephone book." *Id.* at 610–11 (extraneities omitted) (quoting *NovaCare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 478 (2000)).

That said, "the inclusion of some information in compilations which could have been obtained from public sources does not mean the compilations [are] not trade secrets . . . when it would have been immensely difficult to collect and compile it in the form in which it appear[s] in the compilation." *Allstate Ins. Co.*, 79 F.4th at 189.

Whether certain information qualifies as a trade secret has repeatedly been characterized as a case-specific, factual determination. *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 801 (2d Cir. 2023) ("The existence of a trade secret . . . is 'a fact-specific question to be decided on a case-by-case basis.' " (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021))); *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1261 (10th Cir. 2022) ("Whether a compilation constitutes a trade secret is a fact-intensive inquiry."); *Decision Insights, Inc. v. Sentia Grp., Inc.*, 311 F. App'x 586, 592 (4th Cir. 2009) (unpublished) ("Whether or not a trade secret exists is a 'fact-intensive question to be resolved at trial.' " (quoting *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 419 (4th Cir. 1999))); *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 971 (8th Cir. 2011) ("[T]he existence of a trade secret is a fact-intensive inquiry."); *Learning Curve Toys, Inc.*, 342 F.3d at 723 ("[T]he existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances.").

From this then it follows that plaintiffs' trade secrets claims will fail at summary judgment if there is no evidence from which a reasonable juror could have found that the overall weight of the relevant six factors favors plaintiffs. With these legal principles in mind, we evaluate the two client lists, which the Business Court found did not qualify as protectable trade secrets.

*a. Gurley's Customer List*

Gurley's Customer List is an Excel spreadsheet containing the names and addresses of ninety-eight Relation clients serviced by Gurley. The Business Court summarily concluded that Gurley's Customer List was not a trade secret. It reasoned, "[t]he [c]ourt is unpersuaded that Gurley's Customer List should be characterized as a trade secret . . . [because] the basic compilation of client information found in Gurley's Customer List is not the type of compilation that is deserving of trade secret protection." *Rel. Ins., Inc.*, 2024 WL 3549145, at *20. We disagree.

Regarding the first factor, defendants testified that no online source provided those outside the business with a compilation of the clients serviced by plaintiffs. Defendants attempt to rebut this testimony by focusing on the fact that the names and addresses of the *individual* clients can be obtained online. However, this misconstrues the identified trade secret. Gurley's Customer List is a compilation of ninety-eight Relation clients. There is no evidence that such a compilation is publicly available or could have been compiled from public listings. As such, when construing the evidence in the light most favorable to the non-moving party, plaintiffs have

created a genuine issue of material fact as to the public availability of Gurley's Customer List. *See Penalty Kick Mgmt. Ltd v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003) ("The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." (extraneities omitted)).

Regarding the second and sixth factors, plaintiffs presented evidence that Gurley could only recall three of his clients from memory. Defendants offered no evidence that other employees would have known Gurley's clients or had access to the list. Accordingly, there is a genuine issue of material fact regarding the extent to which the ninety-eight clients compiled on Gurley's Customer List were known to employees and others involved in the business and the ease or difficulty with which the information could properly be acquired or duplicated.

Regarding the third factor, plaintiffs presented evidence that their company computer systems were password protected. Defendants do not dispute this fact but rather argue that "the lack of more significant measures is a factor that militates against finding a trade secret." Defendants' argument ignores the summary judgment standard. Plaintiffs' evidence of password protection created a genuine issue of material fact as to the extent of measures taken to guard the secrecy of its client list.

Regarding the fourth factor, plaintiffs have shown that most of Gurley's new clients at Pilot can be identified on Gurley's Customer List. This clearly evinces a

value of the list to the business and its competitors. As such, plaintiffs have created a genuine issue of material fact as to the value of Gurley's Customer List.

Regarding the fifth factor, plaintiffs presented an affidavit of an insurance brokerage industry expert, explaining that "[b]rokerages spend significant amounts of time and money to develop [their client lists]." Moreover, "[b]rokerages spend significant time, expense, and resources compiling information, even while some individual pieces of information may be found online or through other generally available resources." This evidence, combined with the fact that Gurley dedicated nearly a decade to acquiring and developing relationships with his clients at Relation, creates a genuine issue of material fact regarding the amount of effort or money expended in developing the list.

In sum, when construing the evidence in the light most favorable to the non-moving party, as we must do, there are genuine issues of material fact as to whether Gurley's Customer List constitutes a trade secret under the Acts. We reverse the Business Court's conclusion that Gurley's Customer List cannot properly be characterized as a trade secret at the summary judgment stage.

### b. *Client Renewal List*

The Client Renewal List is an Excel spreadsheet containing thirty-seven clients along with their associated insurance policy renewal dates for types of insurance policies, including "Medical," "Dental," and "Ancillary." The spreadsheet was emailed by King from her Relation account to her personal Gmail account on

18 February 2022—merely one day before she accepted her new position at Pilot. The Business Court concluded that the Client Renewal List did not qualify as a protectable trade secret, because "Relation has failed to demonstrate—based on the case law discussed above—that the information contained in the Client Renewal List is sufficient to warrant trade secret protection." *Rel. Ins., Inc.*, 2024 WL 3549145, at *21. For reasons similar to those stated above, we disagree.

Regarding the first factor, plaintiffs presented affidavits stating that a compiled list of Relation clients with their corresponding policy renewal dates cannot be found online. Defendants again respond by arguing that the names and specific policy renewal dates of *individual* clients can be obtained online. However, as made clear above, "the inclusion of some information in compilations which could have been obtained from public sources does not mean the compilations were not trade secrets." *See Allstate Ins. Co.,* 79 F.4th at 189. Defendants have not adequately shown that the Client Renewal List could easily be collected and compiled in the form in which it appears. Accordingly, there is a genuine issue of material fact as to the extent to which the information compiled in the Client Renewal List is known outside the business.

Regarding the second and sixth factors, plaintiffs have introduced evidence tending to demonstrate that King emailed the Client Renewal List to her personal email one day after she accepted her new role at Pilot. This conduct, at the very least, creates a reasonable inference that information contained in the Client Renewal List

is not well known to those involved in the industry and that information cannot be properly acquired or duplicated by others with ease. As such, there is a genuine issue of material fact as to the second and sixth factors.

Regarding the third factor, our analysis from Gurley's Customer List controls. To reiterate, defendants do not dispute that plaintiffs' company computer systems were password protected but rather argue that "the lack of more significant measures is a factor that militates against finding a trade secret." However, this argument ignores the summary judgment standard. For that reason, there is a genuine issue of material fact as to the extent of measures taken to guard the secrecy of its client lists.

Regarding the fourth factor, defendants maintain that the Client Renewal List was created for mere individual convenience, not to be of value to Relation after an employee's departure. However, plaintiffs have presented evidence of the Client Renewal List's value. For instance, plaintiffs have shown that a substantial portion of Lancaster's new Pilot clients are listed on the Client Renewal List taken from Relation. In addition, plaintiffs offered testimony illustrating the importance of knowing each client's renewal date, due to the industry being "very time-sensitive." As such, a genuine issue of material fact exists regarding the value of the Client Renewal List.

Regarding the fifth factor, our analysis largely tracks that for Gurley's Customer List. Plaintiffs produced an affidavit of an insurance brokerage industry expert, explaining that "[b]rokerages spend significant amounts of time and money

to develop [their client renewal histories]" and "[c]lient renewal lists give brokerages the ability to calendar and prioritize their employees' activities, their interactions with their clients, and their interactions with insurance companies." The record reflects that King worked approximately a decade for plaintiffs, presumably developing her client relationships and maintaining those clients' renewal histories. Consequently, there is a genuine issue of material fact as to the amount of effort or money expended in developing the information contained on the Client Renewal List.

In sum, when construing the evidence in the light most favorable to the non-moving party, there are genuine issues of material fact as to whether the Client Renewal List constitutes a trade secret under the Acts. We reverse the Business Court's summary judgment conclusion that the Client Renewal List is not a protectable trade secret.

### 2. *Definition of "Misappropriation"*

Once properly classified as a trade secret under the Acts, it must then be adequately shown that the trade secret was misappropriated. The misappropriation definition under the DTSA differs slightly from that articulated under the NCTSPA.

Under the DTSA, "misappropriation" is defined as follows:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> > (i) used improper means to acquire knowledge of the

trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).

The NCTSPA, for its part, defines "misappropriation" as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1) (2025). The NCTSPA then sets forth criteria to establish a prima facie case of misappropriation. *See* N.C.G.S. § 66-155 (2025). Specifically, § 66-155 of the NCTSPA states:

> Misappropriation of a trade secret is prima facie established by the introduction of substantial evidence that

the person against whom relief is sought both:

    (1) Knows or should have known of the trade secret; and

    (2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

N.C.G.S. § 66-155.

In construing § 66-155(2), the Business Court explained:

> Evidence that a former employee had access to, and therefore an "opportunity to acquire," an employer's trade secrets, without more, is not sufficient to establish a prima facie case of misappropriation. Rather the employer must establish either that the former employee accessed its trade secrets without authorization or provide other sufficient evidence of misappropriation to raise an inference of actual acquisition or use of its trade secrets.

*Rel. Ins., Inc.*, 2024 WL 3549145, at *29 (quoting *Am. Air. Filter Co. v. Price*, No. 16 CVS 13610, 2017 WL 485517, at *8 (N.C. Super. Ct. Feb. 3, 2017)).

Plaintiffs dispute the Business Court's reading of § 66-155. In their view, "a prima facie case is established when an employee worked with and had access to a trade secret during his employment." Stated differently, in the employment context, plaintiffs contend that all a claimant must show is that the employee had a specific opportunity to acquire the trade secret and nothing more. We agree that the NCTSPA encompasses a "specific opportunity to acquire," but we disagree that the inquiry ends there.

By its plain terms, the NCTSPA encompasses both a specific opportunity to acquire a trade secret and actual acquisition of a trade secret. That said, a specific opportunity to acquire alone is not enough. To establish a prima facie case, the specific opportunity to acquire must also be "without the express or implied consent or authority of the owner." N.C.G.S. § 66-155(2).

Upon initial observation, when reading § 66-155(2) it is not plainly obvious whether the condition of "without the express or implied consent or authority of the owner" attaches to the phrase "[h]as had a specific opportunity to acquire [the trade secret] for disclosure or use[.]" However, this uncertainty is clarified upon consulting the definition of misappropriation.

Misappropriation is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent[.]" N.C.G.S. § 66-152(1). Thus, the condition "without express or implied authority or consent" clearly attaches to the phrase "acquisition, disclosure or use."

When construing statutes, we are instructed that "[s]tatutes dealing with the same subject matter must be construed *in pari materia* and harmonized, if possible, to give effect to each." *Bd. of Adjustment of Swansboro v. Town of Swansboro*, 334 N.C. 421, 427 (1993). Accordingly, to harmonize the two provisions and give effect to the definition set forth in § 66-152(1), we must read § 66-155(2) as requiring both (i) a specific opportunity to acquire *and* (ii) an absence of express or implied consent or

authority to disclose or use the trade secret. Moreover, a common sense reading of the statute likewise supports such an interpretation.

This, in turn, means that an employer cannot state a prima facie case against its employee merely by showing that it gave the employee access to its trade secrets at some point. Rather, an employer must show that the employee had the specific opportunity to acquire the trade secret after the employer's express or implied consent or authority ceased to exist.

The Business Court's construction of § 66-155(2) traces back to a Fourth Circuit panel that was tasked with predicting how this Court would read our State's misappropriation statute. *See RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 200 (4th Cir. 2016) (analyzing § 66-155(2) after observing, "the Supreme Court of North Carolina . . . has not had occasion to consider the meaning of the statute"). The Fourth Circuit concluded that § 66-155(2) requires "evidence that the defendant actually acquired or used trade secrets." *Id.* This conclusion, however, reads the phrase "[h]as had the specific opportunity to acquire" out of the statute, in contravention with our rules of statutory construction. *See N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009) ("[W]e give every word of the statute effect, presuming that the legislature carefully chose each word used.").

The Fourth Circuit's reading was shaped principally by its fear of an undesirable outcome, rather than by the text itself. *RLM Commc'ns, Inc.*, 831 F.3d at 200. In its view, if evidence of an opportunity to acquire were permissible, "[e]very

employee in North Carolina who had access to her employer's trade secrets but did not acquire them would have to go to trial to fend off the employer's claim of misappropriation." *Id.*

We take a different view. As explained above, mere access to a trade secret alone is insufficient. There must also be an absence of express or implied consent or authority at the time that the employee had a specific opportunity to acquire the trade secret.

While our construction of § 66-155(2) differs slightly from that articulated by the Fourth Circuit and the Business Court below, it functions in much the same way. To illustrate, § 66-155(2) explicitly states that the opportunity to acquire the trade secret must be a "*specific* opportunity." N.C.G.S. § 66-155(2) (emphasis added). Around the time that § 66-155 was enacted, The American Heritage Dictionary defined "specific" to mean "[e]xplicitly set forth; particular; definite." *Specific*, The American Heritage Dictionary (New College ed. 1980). "Specific" is a limiting term. As such, we are to give a narrow construction of what might be considered a specific opportunity. *See N.C. Dep't of Corr.*, 363 N.C. at 201 ("[W]e give every word of the statute effect . . . .").

Our narrow construction of what qualifies as a "specific opportunity to acquire" effectively mirrors the Business Court's understanding of § 66-155(2). For example, a "specific opportunity to acquire" "without express or implied consent or authority" might include an identifiable instance of a defendant downloading or accessing a

trade secret beyond the scope of that defendant's tasks and duties or without express consent.

This sort of evidence aligns with what courts have found sufficient to establish a prima facie case of misappropriation. *Contrast, e.g.*, *Amerigas Propane, L.P. v. Coffey*, No. 14 CVS 376, 2015 WL 6093207, at \*13 (N.C. Super. Ct. Oct. 15, 2015) (holding that a prima facie case of misappropriation was not established where the claimant "ha[d] not offered evidence that [the defendant-employee] accessed or downloaded customer information from [the plaintiff's] computer database in connection with his departure from the company"), *with, e.g.*, *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 659 (2009) (holding that a prima facie case of misappropriation was established where a defendant, just prior to joining a business competitor, "accessed [the plaintiff's] 'game plan' and other confidential documents from [the plaintiff's] network with unusual frequency").

In short, the plain language of § 66-155(2) permits a claimant to establish a prima facie case of misappropriation with substantial evidence of a specific opportunity to acquire the trade secret—so long as that specific opportunity occurred absent consent or authority of the owner. A specific opportunity must be a discrete, identifiable instance of means to access the trade secret. Therefore, while our construction of § 66-155(2) differs from that stated by the Business Court, it functions much the same.

Once a plaintiff establishes a prima facie claim, a defendant may rebut that claim by introducing "substantial evidence" that the defendant "acquired the information comprising the trade secret by independent development, reverse engineering, or it was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-155; *see also* 18 U.S.C. § 1839(6)(B).

### a. Crooker's Production Analysis

The Business Court dismissed plaintiffs' NCTSPA and DTSA claims against Crooker for retaining a paper copy of a document called "Crooker's Production Analysis." The court reasoned that plaintiffs had not established a prima facie case of misappropriation, because "there is no evidence that [Crooker] ever forwarded, printed or accessed the document following his termination." *Rel. Ins., Inc.*, 2024 WL 3549145, at *30.

On appeal, plaintiffs cite evidence suggesting that Crooker "took [Crooker's Production Analysis] from Relation and had it during litigation to provide to his attorney." Thus, plaintiffs appear to argue that possession alone is sufficient to establish a prima facie claim of misappropriation. Not so. By their plain terms, the NCTSPA and DTSA require that the conduct be made without "consent or authority of the [trade secret's] owner," N.C.G.S. § 66-155(2), or "by improper means," 18 U.S.C. § 1839(5). Plaintiffs do not provide any evidence to suggest that Crooker acquired, had a specific opportunity to acquire, or used the document *without consent or*

*authority*. As such, the allegations and cited evidence on appeal would fall short of establishing misappropriation.

Even still, the shortcomings related to Crooker's Production Analysis stem from a lack of evidence. As recognized above, the Business Court granted plaintiffs' motion for adverse inference. The adverse inference specifically relates to factual defects in plaintiffs' claims. Therefore, to safeguard the Business Court's full exercise of its discretionary function, we reverse and remand the trade secrets claims related to Crooker's Production Analysis.

## C. Breach of Non-Solicitation Clauses of Employment Agreements

In their complaint, plaintiffs asserted breach of contract claims against the Former Employees for allegedly breaching the Non-Solicitation-of-Employees and Non-Solicitation-of-Clients Provisions (collectively, Non-Solicitation Provisions or Provisions) contained in the Employment Agreements.

On 13 April 2022, plaintiffs filed an emergency motion for preliminary injunction (PI Motion) with the Business Court. In their PI Motion, plaintiffs requested that the Business Court prohibit and restrain defendants from committing any acts in violation of the Non-Solicitation Provisions.

The Business Court denied plaintiffs' PI Motion, finding that the Non-Solicitation Provisions were likely unenforceable as a matter of law. Then, in its subsequent Summary Judgment Order, the Business Court explained "that the analysis contained in its [order on plaintiffs' PI Motion] remains legally correct." *Rel.*

*Ins., Inc.*, 2024 WL 3549145, at \*31. The Business Court later concluded, at the summary judgment stage, that the Non-Solicitation Provisions in the Employment Agreements are "unenforceable as a matter of law." *Id.* at \*32.

Plaintiffs appeal the Business Court's conclusion that the Provisions are unreasonably broad and therefore unenforceable. In plaintiffs' view, the Non-Solicitation Provisions are sufficiently narrow to only protect Relation's legitimate business interests.

The Non-Solicitation Provisions contained in each Former Employee's Employment Agreement are substantively identical. The only term that varies among the Employment Agreements is the duration for which the restrictions apply: for producers, the Non-Solicitation Provisions last two years; meanwhile, for account managers, the Non-Solicitation Provisions last just one year. To illustrate the Provisions' material terms, we restate the relevant language from Linthicum's Employment Agreement.

The Non-Solicitation-of-Clients Provision provides, in pertinent part, that the "Employee will not, either directly or indirectly:"

> (i)(A) solicit, or attempt to solicit[,] the insurance or employee benefit plan business of any Client . . . ,
>
> (B) solicit, or attempt to solicit[,] the insurance or employee benefit plan business of any Prospective Client . . . ,
>
> (C) induce Clients to terminate, cancel, not renew or not place business with the Company or any other member of the Ascension Group,

(D) induce Prospective Clients to terminate, cancel, not renew or not place business with the Company or any other member of the Ascension Group,

(E) perform insurance or benefits services of the type sold or provided by the Company or other member of the Ascension Group during the last twelve months of Employee's employment with the Company on behalf of any Clients,

(F) perform insurance or benefits services of the type sold or provided by the Company or other member of the Ascension Group during the last twelve months of Employee's employment with the Company on behalf of any Prospective Clients,

(G) supervise the performance of insurance or benefits services of the type sold or provided by the Company or other member of the Ascension Group during the last twelve months of Employee's employment with the Company on behalf of any Clients, or

(H) supervise the performance of insurance or benefits services of the type sold or provided by the Company or other member of the Ascension Group during the last twelve months of Employee's employment with the Company on behalf of any Prospective Clients. [4]

The restrictions contained in the Non-Solicitation-of-Clients Provision are then limited by the following terms: "The foregoing restrictions . . . shall apply only to those Clients or Prospective Clients with whom Employee had material contact or about whom Employee obtained Confidential Information during the last twelve (12) months of Employee's employment with the Company."

---

[4] As previously discussed, for present-day purposes, "Ascension Group" is now known as "Relation Insurance, Inc." The entity of Ascension Group never changed, just its name. As such, "Ascension Group" contained in the Employment Agreements is understood to as mean referring to Relation.

Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC

*Opinion of the Court*

The Employment Agreement defines "material conduct" as "interaction between Employee and a Client or Prospective Client that was intended to further the business relationship of the Company, or of any other member of the Ascension Group."

The Employment Agreement defines "Confidential Information" as "all information of a confidential or proprietary nature . . . in any form or medium, that relates to or results from the business . . . of the Company or of any other member of the Ascension Group." This definition explicitly extends to, "without limitation": (i) "Client and Prospective Client lists," which include "identifying information"; (ii) "information about and personnel files of employees of the Company or any other member of the Ascension Group, former employees of the Company or any other member of the Ascension Group"; and (iii) "any other information developed or used by the Company or the Ascension Group that is not known generally to the public and that gives the Company or any member of the Ascension Group an advantage in the marketplace."

The Non-Solicitation-of-Employees Provision provides, in pertinent part, that "Employee will not, either on Employee's own account or on behalf of any person . . . or entity, recruit or solicit for employment, [or] attempt to recruit or solicit for employment[,] . . . any employee of the Company or of any other member of the Ascension Group."

The restrictions contained in the Non-Solicitation-of-Employees Provision are

then limited to those employees

> (A) with whom Employee came into contact during Employee's last twelve (12) months of employment with the Company or other member of the Ascension Group, or about whom Employee obtained Confidential Information during Employee's last twelve (12) months of employment with the Company or other member of the Ascension Group, and (B) who is known by Employee at the time of such recruitment . . . to then be employed by the Company or any other member of the Ascension Group.

"Confidential Information" retains the same definition as that stated above.

### 1. *Collateral Estoppel*

Before turning to the merits of plaintiffs' claims, defendants seek to invoke the doctrine of collateral estoppel to estop plaintiffs from enforcing the Non-Solicitation Provisions of the Employment Agreements. As their basis for invoking the doctrine, defendants point to the Smythe Order—the interlocutory order in the Smythe Lawsuit. The Smythe Order found that the restrictive covenants contained in Smythe's employment agreement "are too broadly written and are unenforceable . . . as a matter of law." The restrictive covenants contained in Smythe's employment agreement were substantially similar to those contained in the Former Employees' Employment Agreements. The Smythe Order nevertheless denied Smythe's motion to dismiss the breach of contract claim on the grounds that another provision

contained in the employment agreement was enforceable. The Smythe Lawsuit was subsequently settled by the Settlement Agreement.

To assert defensive-use collateral estoppel, the following elements must be established:

> (1) a valid final judgment on the merits in a previous suit; (2) the later suit involves identical issues; (3) the issue was actually litigated in the prior suit and necessary to the judgment; (4) the issue was actually determined; and (5) the party to be collaterally estopped was a party or in privity with a party to the prior suit, who had a full and fair opportunity to litigate the issue in the earlier action.

*In re A.D.H.*, 388 N.C. 578, 586 (2025).

Importantly, where a claim ends by settlement agreement, it cannot be said that the relevant issues were actually litigated or necessary to the judgment. *See Arizona v. California*, 530 U.S. 392, 414 (2000) ("In the case of a judgment entered by confession, consent, or default, none of the issues [are] actually litigated." (quoting Restatement (Second) of Judgments § 27 (A.L.I. 1982))). Thus, "settlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear . . . that the parties intend their agreement to have such an effect." *Id.*

The issues related to the Non-Solicitation Provisions contained in the Smythe Order were ultimately resolved by the Settlement Agreement. The Settlement Agreement contains no provisions expressing the parties' intent to incorporate the Smythe Order's finding that his employment agreement's non-solicitation provisions were unenforceable. As such, defendants cannot establish that the unenforceability

of the Non-Solicitation Provisions was actually litigated and necessary to the judgment. Plaintiffs are not collaterally estopped from seeking enforcement of the Provisions now.

### 2. *Enforceability of Clauses*

The enforceability of a contract's covenants turns on five elements. The covenant must be: "(1) in writing; (2) reasonable as to terms, time, and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 228 (1990).

The Business Court found that the Employment Agreements' restrictive covenants were unreasonable as to the terms, time, and territory as well as against public policy. "The reasonableness of a [restrictive] covenant is a matter of law for the court to decide." *Wells Fargo Ins. Servs.*, 372 N.C. at 267. The burden is on the party seeking enforcement of a restrictive covenant to prove its reasonableness. *Id.*

On appeal, defendants maintain that the Non-Solicitation Provisions are unenforceable for the same reasons articulated in *Wells Fargo*. Specifically, defendants argue that two terms contained in the Non-Solicitation Provisions stretch the restrictions too broadly—"Ascension Group" and "Confidential Information."

In *Wells Fargo*, it was emphasized that the sheer scope of the company and its affiliates rendered the non-solicitation provisions unreasonable. *Id.* at 268–69. The opinion remarked that, according to publicly available data, "Wells Fargo employed

over 269,000 full-time employees" and its subsidiaries included companies engaged in business distinct from the business in which the defendant had been employed. *Id.* at 269. In other words, in evaluating the enforceability of such provisions, great weight is afforded to size and scope of the company and its affiliates where a non-solicitation provision is tied to such entities. *See also Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 657 (2009) (concluding the restrictive covenants were unenforceable where the provisions "foreclose[d] the solicitation of clients and employees of . . . an unrestricted and undefined set of [the plaintiff's] affiliated companies that engage[d] in business distinct from the . . . business in which [the defendant] had been employed").[5]

The scope of each Former Employee's Non-Solicitation Provision is directly tied to "the Company or any other member of the Ascension Group." To illustrate, the Non-Solicitation-of-Employees Provisions provide that all Former Employees must "not . . . recruit or solicit for employment" or "attempt to recruit or solicit for employment . . . any employee of the Company or of any other member of the Ascension Group." The same is true for the Non-Solicitation-of-Clients Provisions. The scope of each of these provisions expressly stretches across "the Company [and] any other member of the Ascension Group" through the definition of "material

---

[5] This approach mirrors the one taken in the non-compete restrictive covenant context too. There our courts evaluate the reasonableness of a covenant based upon the geographic territory the restriction spans. *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 698 (2016).

contact" and "Confidential Information." Accordingly, it is critical for this Court to possess facts regarding the size and scope of Relation and its affiliated members for our legal analysis.

In its Summary Judgment Order, the Business Court believed that plaintiffs had failed to identify the members of Relation Insurance. This consequently left the Business Court with no information to understand the breadth of the Provisions. The Business Court explained that the Non-Solicitation-of-Employees Provisions, as written, "would foreclose the solicitation of an employee of any of [p]laintiffs' unnamed affiliate companies, potentially precluding solicitation of employees who are engaged in business activities wholly distinct from those as to which the Former Employees had been engaged." *Rel. Ins., Inc.*, 2024 WL 3549145, at *32.

On appeal, plaintiffs cite to an "Organizational Chart" seemingly outlining all of Relation Insurance Holdings, LLC's subsidiaries to illustrate the size and scope of the term "the Company or any other member of [Relation]." Based on this chart alone, plaintiffs claim that "the identity of the employer entity and its operating subsidiaries encompassed by the Former Employees' [E]mployment [A]greements is not in dispute."

However, at oral arguments, plaintiffs reversed course, telling this Court that there *is* a factual dispute as to the meaning and identity of Relation and its affiliated members. Oral Argument at 57:20–57:40, *Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting LLC* (No. 68A25) (N.C. May 22, 2026), https://www.youtube.com/watch?v=

mb2vkq3YnMk (hereinafter Oral Argument). Plaintiffs insisted that such a factual dispute "needs to be decided by a jury." Oral Argument at 57:30–57:40. Defendants, for their part, explained at oral arguments that plaintiffs created and produced the Organizational Chart in discovery, thus constituting inadmissible hearsay. Oral Argument at 34:47–35:20.

Based upon the record before us, we cannot determine whether the Organizational Chart was ever properly presented to the Business Court. We also cannot determine whether the Organizational Chart constitutes inadmissible hearsay. As such, we remand this evidentiary dispute to the Business Court to resolve. In doing so, we emphasize that the burden is on plaintiffs to prove the reasonableness of their Non-Solicitation Provisions. *Wells Fargo Ins. Servs.*, 372 N.C. at 267. Further, Rule 56(e) requires affidavits supporting or opposing a motion for summary judgment to "be made on personal knowledge, [and to] set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." N.C.G.S. § 1A-1, Rule 56(e).

In sum, the breadth of each non-solicitation provision is linked to the size and scope of Relation and its affiliated members. *Wells Fargo* underscores the importance of a company's size and scope to the legal enforceability of restrictive covenants where those covenants explicitly tether their restrictions to the company. 372 N.C. at 268–69. We remand plaintiffs' breach of contract claim (which seeks to enforce the Non-Solicitation Provisions) to the Business Court, because there are evidentiary

disputes regarding the size and scope of Relation and its affiliated members. In doing so, we emphasize that plaintiffs bear the burden of proving the reasonableness of their Non-Solicitation Provisions, and plaintiffs cannot oppose a summary judgment motion based upon incompetent evidence, such as hearsay.

### 3. *Blue-Pencil Doctrine*

Finally, plaintiffs asked the Business Court, in the alternative, to apply the "blue-pencil" doctrine to save their Non-Solicitation Provisions if the court were to find those provisions to be unenforceable.

The blue-pencil doctrine is a doctrine in equity, designed to save a contract where particular restrictions are deemed unreasonable and unenforceable. *Welcome Wagon Int'l, Inc. v. Pender*, 255 N.C. 244, 248 (1961). It is a "kind of selective enforcement" of various covenants contained in a single contract. 6 Richard A. Lord, *Williston on Contracts* § 13:31 (4th ed. 2025). Generally, under the blue-pencil doctrine, courts "will sever unreasonable, divisible portions and then enforce the reasonable parts that remain, usually without rewriting the covenant by adding, changing, or rearranging terms." *Id.*

"North Carolina has adopted the 'strict blue[-]pencil doctrine' under which a court cannot rewrite a faulty [restrictive covenant] but [instead] may enforce divisible and reasonable portions of the covenant . . . ." *Beverage Sys. of the Carolinas, LLC*, 368 N.C. at 696; *see also Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528

(1989) ("If the contract is separable, however, and one part is reasonable, the courts will enforce the reasonable provision.").

North Carolina's strict application of the doctrine stems from our traditional contract law rule that "[t]he courts will not rewrite a contract if it is too broad but will simply not enforce it." *Whittaker Gen. Med. Corp.*, 324 N.C. at 528. In the employment context, especially, this strict application makes practical sense as well.

As other courts have observed, "[f]or every agreement that makes its way to court, many more do not." *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1286 (Ariz. 1999). Overly broad restrictions can have an *in terrorem* effect on departing employees. *Id.*; *Hassler v. Circle C. Res.*, 505 P.3d 169, 177 (Wyo. 2022). Under a liberal blue-pencil standard, employers are encouraged to create ominous covenants, knowing that if the provisions are contested, courts will modify the agreement to make it enforceable—all the while maintaining the added benefit that departing employees may adhere to the onerous covenant without challenge.

To avoid this injustice, North Carolina courts will only blue-pencil an unreasonable covenant that is "separable" or "divisible" from the reasonable, enforceable covenant. *Whittaker Gen. Med. Corp.*, 324 N.C. at 528; *Beverage Sys. of the Carolinas*, 368 N.C. at 696. Only those separable or divisible covenants may be fairly stricken out. This is rooted in the notion that a natural reading of such a contract would indicate that the parties separately intended to agree to each separable covenant. In other words, the agreement to one covenant is not influenced

by the agreement to another. Therefore, maintaining the enforceability of a separate, reasonable covenant preserves the parties' contractual intent to the greatest extent practicable while not altering the bargained-for exchange.

Below, the Business Court "decline[d] to consider application of the 'blue[-]pencil' doctrine because Relation (as the party seeking application of the doctrine) ha[d] not met its burden of demonstrating precisely how it c[ould], or should, be applied on these facts." *Rel. Ins., Inc.*, 2024 WL 3549145, at \*32. Plaintiffs, in their reply brief to this Court, narrow their request for blue-penciling. Specifically, plaintiffs ask that the "Ascension Group" term be rewritten as:

> the Company ~~or with any other member of the Ascension Group~~.

Further, plaintiffs request that the term "Confidential Information" be rewritten as:

> During the Restriction Period, the foregoing restrictions . . . shall apply only to those Clients with whom Employee had Material Contact ~~or about whom Employee obtained Confidential Information within twelve (12) months prior to the Termination Date~~.

On appeal, issues related to blue-penciling are reviewed de novo. *See generally Welcome Wagon Int'l*, 255 N.C. at 248.

By our own count, plaintiffs' request to blue-pencil only the "Ascension Group" term results in striking at least forty-six separate clauses contained within various provisions of just one of the seven total Employment Agreements. Simply stated, plaintiffs are seeking to invoke the blue-pencil doctrine for interlineation deletions in over forty different places throughout a single contract. As detailed above, North

Carolina's strict application of the blue-pencil doctrine does not allow courts to surgically excise language. The provision sought to be removed must be separable or divisible from the provision sought to be enforced. Since plaintiffs do not request blue-penciling of a separable, divisible provision from an otherwise enforceable provision, blue-penciling cannot apply. We remand the Non-Solicitation Provisions as they are written.

**D. Breach of the Settlement Agreement**

At the Business Court, plaintiffs brought claims for breach of the Settlement Agreement against Smythe, Capps, Kinney, and Pilot. The Settlement Agreement, in relevant part, prohibited Pilot from soliciting any employee of Relation "through and including" 31 March 2021. The Business Court found that its "review of the record fails to reveal any evidence of solicitations of Relation employees by [Pilot] during the period from 11 March 2021 and 31 March 2021." *Rel. Ins., Inc.*, 2024 WL 3549145, at *38. Instead, the Business Court observed that "Relation has merely shown that Crooker [and Pilot] were clients of the same attorney at the same time" and that there were "several chance encounters between a Relation employee and one of the Managing Members of [Pilot] in a public place." *Id.* at *38–39.

Before this Court, plaintiffs argue that the Business Court improperly drew factual inferences in favor of the moving party, *defendants*, rather than plaintiffs. Moreover, plaintiffs explain that "the one reason there was not *more* evidence was because of [d]efendants' spoliation."

Plaintiffs' arguments on appeal directly invoke the adverse inference issue that the Business Court failed to identify with specificity. For the reasons articulated above, we reverse and remand plaintiffs' claim for breach of the non-solicitation-of employees-clause of the Settlement Agreement for the Business Court to exercise its discretionary function.

## E. Unjust Enrichment

Below, plaintiffs brought an unjust enrichment claim against all defendants, alleging defendants received plaintiffs' confidential information, clients, and employees and then intentionally leveraged that information for Pilot's benefit. The Business Court granted defendants' motion for summary judgment as to the claim on the grounds that plaintiffs' claim for breach of the confidentiality provisions of the Employment Agreements "encompasses the same subject matter as the unjust enrichment claim." *Rel. Ins., Inc.*, 2024 WL 3549145, at *42. We affirm the Business Court's grant of summary judgment, but on alternative grounds.

A claim for unjust enrichment is "a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570 (1988). "The claim is not based on a promise but is imposed by law to prevent an unjust enrichment." *Id.* As such, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Id.* To establish a claim for unjust enrichment, a plaintiff must prove that: (1) the plaintiff conferred a benefit on another party; (2) the other party consciously accepted the benefit; and (3) the benefit was not conferred

gratuitously or by an interference in the affairs of the other party. *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002) (citing *Booe*, 322 N.C. at 570).

Plaintiffs, on appeal, dispute which provision of the Employment Agreements encompasses their unjust enrichment claim. Plaintiffs suggest that it is the Non-Solicitation Provisions that pertain to their unjust enrichment claim, not the confidentiality provisions of the Employment Agreements. On this basis, plaintiffs' unjust enrichment claim may serve as an "alternative claim" if the Non-Solicitation Provisions are deemed unenforceable. *See Bandy v. Gibson*, No. 16 CVS 456, 2017 WL 3207068, at *4 (N.C. Super. Ct. July 26, 2017) (recognizing that a claimant may plead an express contract and a claim for unjust enrichment in the alternative). Meanwhile, defendants argue that unjust enrichment "only applies where the 'contract as a whole,' rather than any 'particular clause,' is invalid." In our view, however, plaintiffs' unjust enrichment claim fails for a more straightforward reason.

The underlying basis for plaintiffs' unjust enrichment claim is that the Former Employees took or wrongfully retained Relation's clients, employees, and confidential information and gave them to Pilot. However, a taking and transferring of another's property without permission is not a willing transfer. Accordingly, plaintiffs have not shown that they "*conferred*" the benefits on defendants. *See, e.g.*, *KNC Techs., LLC v. Tutton*, No. 19 CVS 793, 2019 WL 6219035, at *14 (N.C. Super. Ct. Oct. 9, 2019) ("Alleging merely that the [d]efendants have taken for themselves some benefit to which [the] [p]laintiff believes it is rightfully entitled does not state a claim for unjust

enrichment."); *Chisum v. Campagna*, No. 16 CVS 2419, 2017 WL 5161978, at *11 (N.C. Super. Ct. Nov. 7, 2017) (explaining that there is no unjust enrichment claim where a plaintiff "does not allege that he conferred any benefit on [the defendants], but rather only that the [defendants] 'received' or 'wrongfully retained' benefits from their alleged misconduct").

Plaintiffs have not established a claim for unjust enrichment. Accordingly, we affirm summary judgment as to this claim.

## F. Computer Fraud and Abuse Act

Plaintiffs brought claims for computer trespass under both federal and state law against the Former Employees. The Business Court granted the Former Employees' motion for summary judgment only as to plaintiffs' federal law claim brought under the Computer Fraud and Abuse Act of 1986 (CFAA). 18 U.S.C. § 1030.

The CFAA subjects to liability anyone who "intentionally accesses a computer *without authorization* or *exceeds authorized access*" and thereby obtains computer information. *Id.* § 1030(a)(2) (emphasis added).[6] Based on its understanding of the statutory language "exceeds authorized access," the Business Court found that "there is no evidence of any unauthorized access by the Former Employees." *Rel. Ins., Inc.*, 2024 WL 3549145, at *44. Plaintiffs appealed.

---

[6] In addition, civil actions under the CFAA are limited to actions where a party has suffered a loss of at least $5,000 during a one-year period. 18 U.S.C. § 1030(c)(4)(A)(i)(I).

On appeal, plaintiffs argue that their claim is "based on evidence that the Former Employees exceeded the scope of the access they were provided, including after their employment at Relation." In plaintiffs' view, evidence of access *after* employment and continued use of confidential documents *after* employment falls within the CFAA's "exceeds authorized access" prohibition. We agree in part.

The Business Court relied upon *Van Buren v. United States*, 141 S. Ct. 1648 (2021), to discern the meaning of the phrase "exceeds authorized access." In *Van Buren*, a police sergeant in Georgia used his patrol-car computer to access the state law enforcement computer database with his valid credentials. *Id.* at 1653. However, the search he conducted was entirely unrelated to his police sergeant duties. *Id.* Instead, the sergeant conducted his search to retrieve information about a particular license plate number in exchange for money. *Id.*

The Supreme Court of the United States held that the improper search fell outside the scope of the CFAA's "exceeds authorized access" prohibition. *Id.* at 1662. In construing the phrase "exceeds authorized access," the Court adopted a "gates-up-or-down inquiry." *Id.* at 1658–59. Under this inquiry, courts need not determine whether a defendant obtained information for an "improper purpose," but instead must analyze whether a defendant obtained the information on a computer system or within an area of the computer system that is "off limits to him." *Id.* at 1662.

While *Van Buren*'s "gates-up-or-down" test is instructive, the case does not confront the distinct issue of post-employment access. However, the federal courts of

appeals have had such occasions to confront the issue. Their cases are particularly helpful to the arguments presented here.

*United States v. Eddings*, 161 F.4th 199 (3d Cir. 2025), a Third Circuit case, directly addresses post-employment computer access under the CFAA. At the outset, *Eddings* observed that the governing framework for post-employment conduct typically turns on the CFAA's "without authorization" prohibition rather than its "exceeds authorized access" limitation. *Id.* at 201. *Eddings* then formulated a simple standard for identifying "without authorization." The *Eddings* standard provides that, absent an applicable contract or policy, the employer must take some "affirmative act" to rescind permission to access the employer's computer. *Id.* at 206. In essence, employee resignation alone is "not enough." *Id.* at 205.

What, precisely, constitutes an "affirmative act" to rescind permission is not conclusively defined. Indeed, "[s]o long as there is evidence the employer took some step to rescind the employee's permission, it is up to the jury to decide whether, as a matter of fact, that action sufficed." *Id.* at 209. Even so, certain acts have been recognized as sufficient for revoking access, including the issuance of a cease-and-desist letter, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016); the revocation of login credentials, *United States v. Nosal*, 844 F.3d 1024, 1036 (9th Cir. 2016), *overruled in part on other grounds by Lagos v. United States*, 584 U.S. 577 (2018); and the firing of a former employee, *United States v. Shahulhameed*, 629

F. App'x 685, 688 (6th Cir. 2015) (unpublished), *cited with approval in Abu v. Dickson*, 107 F.4th 508, 516 (6th Cir. 2024).

On appeal, plaintiffs point to three instances of Former Employees exceeding authorized access to establish their CFAA claim. We address each in turn.

### 1. *King's Access of "Carrier Portals"*

First, plaintiffs contend that King accessed Relation's "carrier portals" and "gave everyone at Pilot access to Relation's account on a carrier's website" after leaving Relation. To substantiate this first allegation, plaintiffs cite to several documents in the record clearly indicating that, on 26 April 2022, King logged into her old Relation account to access a vendor portal, causing a series of security alerts to Relation staff. The security alerts indicated that several other Pilot employees, including Kinney, accessed the same Relation vendor portal. And significantly, King's access of the portal occurred nearly two months after Relation issued its cease-and-desist letter to King and two weeks after plaintiffs filed their PI Motion in this matter.

Based on federal circuit precedent, the 1 March 2022 cease-and-desist letter to King revoked her authorization to access old Relation accounts. *Facebook*, 844 F.3d at 1067 (holding that "[a plaintiff] expressly rescinded . . . permission when [the plaintiff] issued its written cease and desist letter to [the defendant]"). In fact, the cease-and-desist letter explicitly directed King to "NOT . . . use . . . [or] transfer . . . any Company property or confidential information you have stored on any mobile device, computer, . . . or any other cloud-based storage program . . . including but not

limited to any emails, production reports, customer lists, policy and contract renewal and expiration dates and data."

This instruction was sufficient to inform King that her access to Relation property, including online accounts, had been revoked. As such, plaintiffs have presented sufficient evidence that King's access of and distribution of access to the "carrier portals" was "without authorization" under the CFAA.

The Business Court erred in awarding defendant King summary judgment as to plaintiffs' CFAA claim against King on the basis that she had not accessed information "without authorization."

### 2. *Crooker's Access of "Expiration Lists"*

Second, plaintiffs allege that Crooker took expiration lists by "impermissibly accessing Relation's computers." To support this allegation, plaintiffs cite to deposition testimony of Jill Zewalk, Relation's Chief Operating Officer. Zewalk's testimony explained that Crooker "had taken some expiration lists" from Relation "[b]efore he resigned from Relation." She further testified that producers at Relation, like Crooker, "didn't have access to" the Relation database that held the expiration lists. When asked why producers did not have access to the database, Zewalk replied, "That's just a Relation rule. Always has been."

Based on Zewalk's deposition testimony, it appears there is a genuine issue of material fact as to existence of the "Relation rule" that supposedly barred producers, like Crooker, from accessing the database containing the expiration lists. *See Lowe v.*

*Bradford*, 305 N.C. 366, 370 (1982) ("The opposing party need not convince the court that he would prevail on a triable issue of material fact but only that the issue exists."). If the existence of this Relation rule is proven, then Crooker's access of the expiration lists would constitute "exceeding authorized access," as that particular area of Relation's computer system was seemingly off limits to him. *See Van Buren*, 593 U.S. at 396 ("[A]n individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer . . . that are off limits to him.").

The Business Court erred in awarding defendant Crooker summary judgment as to plaintiffs' CFAA claim against Crooker on the basis that he had not accessed information in a manner that "exceed[ed] authorized access." (Alteration in original.)

### 3. *Former Employees' Emails and Screenshots*

Finally, plaintiffs assert that all "Former Employees emailed confidential documents to their personal email accounts and took screenshots of information from Relation's computers to use at Pilot." Plaintiffs do not cite any record evidence to support this assertion. Ordinarily, lack of record evidence would entitle the moving party to summary judgment. *See Lowe*, 305 N.C. at 369 ("A party moving for summary judgment may prevail if it meets the burden . . . of showing through discovery that

the opposing party cannot produce evidence to support an essential element of his or her claim.").[7]

Nevertheless, the core infirmity in this CFAA allegation is an absence of evidence. Once again, we encounter the Business Court's spoliation of evidence finding and this Court's inability to determine where and how the adverse inference might apply to the factual defects in this claim. Therefore, we conclude that the best course of action here is to reverse and remand the issue. In our view, remand will afford the Business Court the broadest latitude to exercise its discretionary function.

\* \* \*

For these reasons, we reverse and remand the Business Court's grant of summary judgment as to plaintiffs' CFAA claim against all Former Employees. In addition, we recognize that civil liability under the CFAA is strictly limited to those claims resulting in loss "aggregating at least $5,000 in value" during any "1-year period." 18 U.S.C. § 1030(c)(4)(A)(i)(I). As such, the Business Court must undertake an additional inquiry as to the extent of loss resulting from the civil claims.

**G. Clarifying Order**

On 1 August 2024, the Business Court issued its Clarifying Order. The Clarifying Order modified the previously entered Summary Judgment Order by granting defendants summary judgment as to plaintiffs' claims for tortious

---

[7] In addition, it bears noting that plaintiffs' assertion suggests access for an "improper purpose" which falls squarely outside the CFAA as a matter of law. *See Van Buren*, 593 U.S. at 396.

interference with business and contractual relations, tortious interference with prospective economic advantage, and unfair and deceptive trade practices against Kinney and Capps. The Clarifying Order further modified the previously entered Summary Judgment Order by granting defendants summary judgment as to plaintiffs' same claims (with the exclusion of their unfair and deceptive trade practices claim) against Pilot.

Despite its name, there is nothing "clarifying" about the order. The Clarifying Order provides no legal analysis or legal basis for its grant of summary judgment as to these claims.

In 2014, the North Carolina General Assembly enacted the Business Court Modernization Act. An Act to Modernize the Business Court by Making Technical, Clarifying, and Administrative Changes to the Procedures for Complex Business Cases, to Streamline the Process of Corporate Reorganization Utilizing Holding Companies, and to Establish a Business Court Modernization Subcommittee of the Joint Legislative Economic Development and Global Engagement Oversight Committee, S.L. 2014-102, § 2, 2014 N.C. Sess. Laws 621. The Act specifically modified N.C.G.S. § 7A-45.3 to provide that "[t]he presiding Business Court Judge *shall* issue a written opinion in connection with any order granting or denying a motion under [N.C.]G.S. 1A-1, Rule . . . 56." *Id.* at § 2, 2014 N.C. Sess. Laws at 622 (emphasis added); *see* N.C.G.S. § 7A-45.3 (2025).

The Clarifying Order granted defendants' summary judgment motion

pursuant to Rule 56 without written opinion in direct contravention of § 7A-45.3's plain text. Accordingly, we reverse and remand those claims for which the Business Court summarily granted summary judgment. The presiding Business Court Judge shall issue a written, reasoned opinion in connection with defendants' summary judgment motion.

## IV.    Conclusion

Based on the foregoing, we affirm the Business Court's grant of summary judgment as to plaintiffs' unjust enrichment claim but reverse the Business Court's grant of summary judgment as to all other claims plaintiffs raised on appeal and remand for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.